O P I N I O N
Davel V. Chinn appeals from a judgment of the Montgomery County Court of Common Pleas which denied his petition for post-conviction relief.
The record reveals as follows. On August 23, 1989, a jury convicted Chinn of the aggravated murder of Brian Jones. Upon the jury's recommendation, the trial court sentenced Chinn to death. Chinn appealed his conviction. We affirmed his convictions but reversed his death sentence and remanded the case. State v. Chinn (Dec. 27, 1991), Montgomery App. No. 11835, unreported. On December 6, 1994, the trial court sentenced Chinn to death again. He appealed that sentence and on June 21, 1996, we vacated his death sentence and remanded the case again for re-sentencing because Chinn had not been present when the trial court had sentenced him to death. State v. Chinn (June 21, 1996), Montgomery App. No. 15009, unreported. On September 25, 1996, Chinn was sentenced to death again. We affirmed that sentence in State v. Chinn (Aug. 15, 1997), Montgomery App. No. 16206, unreported. The Supreme Court of Ohio also affirmed Chinn's convictions and sentence of death. State v. Chinn
(1999), 85 Ohio St.3d 548, 709 N.E.2d 1166, certiorari denied (2000), ___ U.S. ___, 120 S.Ct. 944.
On March 14, 1997, Chinn filed a petition for post-conviction relief. The trial court denied Chinn's petition without a hearing. Chinn appealed the dismissal of his petition. We reversed the trial court's decision and remanded the case for an evidentiary hearing on the issue of whether Chinn's trial counsel had been ineffective because he had not called expert witnesses on eyewitness identification and mental retardation.State v. Chinn (Aug. 21, 1998), Montgomery App. No. 16764, unreported, discretionary appeal not allowed (1999), 84 Ohio St.3d 1474,704 N.E.2d 581. An evidentiary hearing was held on February 10, 2000. On September 7, 2000, the trial court denied Chinn's petition for post-conviction relief.
Chinn now appeals the trial court's September 7, 2000 decision. He raises four assignments of error. Because his first and second assignments raise similar issues, we will address them together.
 I. THE TRIAL COURT ERRED IN NOT FINDING TRIAL COUNSEL INEFFECTIVE FOR FAILING TO PRESENT TESTIMONY OF AN EXPERT ON EYEWITNESS IDENTIFICATION AT APPELLANT CHINN'S CAPITAL TRIAL, IN VIOLATION OF MR. CHINN'S RIGHTS AS GUARANTEED BY THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, §§ 9, 10 AND 16 OF THE OHIO CONSTITUTION.
 II. THE TRIAL COURT ERRED IN NOT FINDING TRIAL COUNSEL INEFFECTIVE FOR FAILING TO PRESENT EXPERT TESTIMONY ON MENTAL RETARDATION AT APPELLANT CHINN'S CAPITAL TRIAL, IN VIOLATION OF MR. CHINN'S RIGHTS AS GUARANTEED BY THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, §§ 9, 10 AND 16 OF THE OHIO CONSTITUTION.
Chinn argues that his trial counsel's failure to present testimony from experts on eyewitness identification and mental retardation constituted ineffective assistance of counsel.
At Chinn's trial, the state's key witness was Marvin Washington, a juvenile who testified that he had helped Chinn rob and murder Jones. Chinn denied participation in the crime and claimed that he did not know Washington. Washington is now deceased.
In his petition for post-conviction relief, Chinn alleged, inter alia, that his trial counsel should have presented an expert to testify about eyewitness identification and an expert to testify that Washington had suffered from mental retardation and that such retardation had affected his ability to remember and testify about the evening of the crime. With his petition, he presented affidavits from Solomon M. Fulero, Ph.D., J.D. and Caroline Everington, Ph.D. In reversing the trial court's first denial of his petition, we concluded as follows:
 Given the information contained within [the Fulero and Everington] affidavits, we find that trial counsel's failure to call any expert witnesses could rise to the level of ineffective assistance of counsel prejudicial to the rights of the defendant. Thus, we conclude that the trial court should have conducted an evidentiary hearing to determine more fully the nature of the testimony of these two witnesses, as well as the strategical reasoning of trial counsel for not presenting this expert testimony.
 On remand, an evidentiary hearing was held. Fulero, Everington, and Michael Monta testified on behalf of Chinn. Barbara DeVoss, David Lantz, and Dr. Thomas O. Martin testified on behalf of the state.
Fulero testified that he held a J.D. and a Ph.D. in psychology and had published on the subject of the reliability of eyewitness identification. He said that had he testified at Chinn's trial, he would have informed the jury as follows. The accuracy of eyewitness evidence is not as "great" as lay witnesses believe it to be because a person's memory can be faulty for many different reasons. The following factors can affect a person's ability to acquire, store, and recall memories. The longer a witness is able to look at a perpetrator's face, the more accurate his later identification of the perpetrator will be, with the total length of exposure to an event not being as relevant as the length of time the witness can actually look at the perpetrator's face. The presence of a salient detail, such as a weapon, is significant because it draws a witness's attention away from the perpetrator's face. Fulero testified that people who report fear for their lives during an event are often less accurate in subsequent attempted identification procedures. Fulero stated that cross-race identifications are less accurate than same-race identifications, with the lowest accuracy resulting when a white person attempts to identify a black person. He said that mentally retarded people show a decreased accuracy rate in making later identifications and are also more suggestible and often have desires to please authority and to hide their mental retardation. He also stated that if a witness is alcohol-impaired at the time of the event, his later recall will be less accurate unless he is alcohol-impaired at the time he recalls it as well.
Fulero stated that the longer the period of time between the event and the person's attempt to retrieve his memory, the less accurate that memory will be. He also said that during the period of time between the event and the witness's attempt to retrieve his memory, post-event information given to the witness can become part of his initial memory of what occurred at the event and thus his own actual memory of what happened at the event will be less accurate. Fulero also testified that there is really no relationship between a witness's confidence level in the accuracy of his memory and the actual accuracy of his memory because post-event information usually changes a witness's confidence level in the accuracy of his memory.
On cross examination, Fulero testified that it was not his role to tell the jury whether a witness's memory was correct or wrong because such judgment would be beyond the scope of his knowledge. He stated that his role in Chinn's trial would have been to give the jurors knowledge about eyewitness identifications that would have helped them make their decision.
Everington testified that she was an associate professor in the department of educational psychology at Miami University. She testified that she had researched and published in the field of mentally retarded offenders in the criminal justice system. She indicated that the Public Defender's Office had contacted her and asked her to review the following documents pertaining to Washington: his juvenile court records, a social history report, a police interview, a transcript of his testimony against Chinn, several psychological evaluations, a neuropsychological assessment, and his school records. She testified that each of those records clearly showed the presence of moderate range mental retardation in Washington, indicating that his IQ had been below the lowest two percent of the population. She reported that Washington had had "profound academic deficits" as he had scored below a third grade level, the lowest level possible, on achievement tests when he had been thirteen years old. She stated that people who suffer moderate mental retardation need support in many areas of their lives and are less likely to live completely independently. She stated that they might not be literate and are frequently unable to do "first grade kinds of academic tasks" such as telling time.
Everington stated that the psychological reports revealed that Washington had had a limited ability to comprehend, had been easily swayed by others, had been eager to please authority figures, had been easily distracted, and had had significant weaknesses in long-term recall. She stated that the neuropsychological assessment indicated that Washington had suffered cranial abnormality that had caused a neuropsychological impairment that would have led Washington to distort and confuse new information. According to Everington's interpretation of the chemical assessment, Washington had "function[ed] well below his level," had consumed alcohol on the evening of the crime, and had reported at least three blackout episodes. She also noted that Washington's school records indicated that he had been in a developmentally handicapped class.
Based upon her review of Washington's testimony at Chinn's trial, Everington stated that Washington had been unable to tell time, had been unable to recall or had given inconsistent answers to questions about temporal events, had had deficits in receptive learning in that he had not understood questions, had given inappropriate responses to questions, had asked for questions to be rephrased, and had had memory problems in that he had been unable to recall important facts from the night of the crime. On direct examination, Everington concluded that in her professional opinion, Washington had had "significant deficits in the memory" and that "his memory [had been] *** questionable."
During cross examination, Everington admitted that she had no first-hand knowledge about Washington because she had never met him. She stated that she does not administer IQ tests because she is not a psychiatrist or psychologist. She agreed that Washington had been consistent with his story about the night of the crime. She also stated that while the police might have influenced the truthfulness of Washington's testimony, it was equally possible that Washington had not been influenced and had testified truthfully about what had happened on the night of the crime.
Michael Monta was Chinn's trial counsel. Monta had had fifteen years of experience in criminal cases and "had participated" in one other capital murder case prior to his appointment to represent Chinn. He testified that to prepare Chinn's case, he had filed a discovery motion and had received Washington's juvenile record, pre-interview forms, statements, and police reports. Monta did not receive Washington's psychological reports, social history, neuropsychological reports, or juvenile court personnel evaluation. He said that such information would have been helpful in his defense of Chinn because he could have used it during his cross examination of Washington to ask about his previous blackouts and his ability to remember things. He also stated that had he had such information, he "may very well" have had an expert examine Washington to assess his credibility and to determine whether his testimony could have been impeached.
On cross examination, Monta stated that he had met Washington prior to Chinn's trial. He stated that he had perceived Washington to be "young, uneducated, [and] not especially bright" but stated that Washington had "seemed to understand what the situation was and what he was doing there." Monta stated, "I'm not a psychologist but I'[ve] seen some psychology reports in my time; and I thought [Washington] probably would have passed that muster any way." When asked if the case against Chinn centered solely on Washington's identification of Chinn, Monta stated "probably not completely" because there were other witnesses who had testified at trial and had implicated Chinn in the commission of the crime. Monta noted, however, that Washington had been the only witness against Chinn who had been with him on the night of the crime continually from 6:45 p.m. until shortly after midnight.
Barbara DeVoss testified on behalf of the state. She stated that she was a social worker with almost thirty years of experience. She testified that she had provided counseling for boys on her "living unit" at the Training Center for Youth and had been assigned to counsel Washington in April 1989. She stated that she had interacted with Washington every day for at least some period of the day between April 1989 and August 1992. DeVoss stated that before she met Washington, she had read the reports and materials on him and had thought, "oh, my God, I have got a blooming idiot." She stated that after she had started spending time with Washington, however, she had been pleasantly surprised. She testified that although the reports had stated Washington would have problems grooming himself, he had, in fact, groomed himself very well and "was quite particular on how he looked." DeVoss said that Washington had "kept his appearance up" and had ironed his clothes because he had wanted to look nice and clean. She stated that Washington had been able to do things on his own initiative and had worked himself up to the highest level program and had been placed in an outside honor group where only ten other boys had been and he had been given a "fair amount of freedom and responsibility" in that position. DeVoss testified that after Washington had worked and saved money, she had purchased a watch for him and he had been able to read it and use it correctly to meet appointments. DeVoss also stated that she knew Washington was literate because she had heard him read aloud and she knew he had read Sports Illustrated, stories, and novels. She testified further that Washington had been able to balance a checkbook, count money, and make change with money. She testified that she did not think that Washington had had a low IQ as stated in the psychological reports.
DeVoss stated that Washington had written a letter to the juvenile court judge who had sentenced him for his participation in Jones' murder asking for early release and that the judge had written back stating that he would consider Washington for early release after he had graduated from high school. DeVoss stated that after Washington had received that information, he had been quite motivated and had eventually earned a "regular diploma[,]" had been valedictorian of his class, and had given a "talk" at the graduation. DeVoss also stated that Washington had never attempted to go "AWOL."
On cross examination, DeVoss admitted that she had not known Washington prior to April 1989. She stated that some of the staff at the training center provide a very nurturing environment for young people. She testified that Washington had been placed with learning disabled students when he had first arrived at the training center. DeVoss also agreed that there had been a marked improvement in Washington after he had been sent to the training center.
David Lantz also testified on behalf of the state. He had been the chief investigator in the murder of Jones and had interviewed Washington six days after the crime. Washington had been fifteen years old at the time of the crime. Lantz stated that during the interview, Washington had given a long narrative of the events of the crime and then had answered follow-up questions. Lantz said that Washington's story had been internally consistent and had made sense. Lantz stated that Washington had appeared to understand questions and had given appropriate answers. Lantz also said that Washington had drawn a diagram of the parking lot scene where the crime had begun and that his drawing had matched a drawing made by another victim of the crime.
Lantz testified that Washington had eventually picked Chinn's photograph from a photo spread, after not making picks from earlier photo spreads that had not contained Chinn's photo. Lantz stated that during a police lineup that had included Chinn, Washington had indicated that he had not seen the suspect. After Washington was taken to an interview room, however, he indicated that he wanted to see Lantz and eventually told Lantz that the suspect had been in the lineup and was Chinn. Washington told Lantz that he had been afraid to identify him while the suspects were standing on the stage. Lantz stated that Washington's trial testimony against Chinn had been consistent with his original story. He also testified that nothing about his interactions with Washington had led him to think that Washington had been mentally retarded or had been unable to give a truthful account of the event.
Dr. Thomas O. Martin testified that he was a clinical psychologist. He stated that a number of things can affect a person taking an IQ test, such as motivation, hallucinations, brain injury, and a lack of education. He stated that little can be known by looking solely at a person's IQ scores because IQ scores tell how a person compares to similar aged people in terms of intelligence. He said that IQ scores do not give information about a person's level of adaptive functioning. Martin stated that a person who is born moderately mentally retarded would not be expected to graduate from high school, to drive a car, to write checks, to read books, to make change with money, or to be able to hold down unsupervised jobs. On cross examination, Martin testified that he had reviewed Washington's neuropsychological report and that such report had indicated a congenital cranial abnormality that could have affected his IQ score and memory functioning.
"To obtain a reversal of a conviction on the basis of ineffective assistance of counsel, the defendant must prove (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome of the proceeding."State v. Madrigal (2000), 87 Ohio St.3d 378, 388-389, 721 N.E.2d 52, 64, certiorari denied (2000), ___ U.S. ___, 121 S.Ct. 99, citing Stricklandv. Washington (1984), 466 U.S. 668, 687-688, 104 S.Ct. 2052, 2064; accordState v. Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraphs two and three of syllabus, certiorari denied (1990), 497 U.S. 1011,110 S.Ct. 3258. A defendant's failure to satisfy one prong of this test negates a court's need to consider the other prong of the test.Madrigal, 87 Ohio St.3d at 389, 721 N.E.2d at 64, citing Strickland,466 U.S. at 697, 104 S.Ct. at 2069.
To meet the first prong of the Strickland test, the defendant must show that his counsel's conduct was objectively deficient by producing evidence that the counsel acted unreasonably. State v. Keith (1997),79 Ohio St.3d 514, 534, 684 N.E.2d 47, 65, certiorari denied (1998),523 U.S. 1063, 118 S.Ct. 1393-1394. Defense counsel's performance will be deficient if it "falls below an objective standard of conduct which is reasonable under prevailing professional norms." State v. Peeples
(1994), 94 Ohio App.3d 34, 45, 640 N.E.2d 208, 215, affirmed (1995),74 Ohio St.3d 153, 656 N.E.2d 1285. Counsel's performance falls below professional norms "if he fails to advocate the defendant's cause, fails to keep the defendant informed of important developments, or fails to use the requisite level of skill necessary to ensure the integrity of the adversarial proceedings." Id. Further, we "`must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" State v. Mason (1998),82 Ohio St.3d 144, 157-158, 694 N.E.2d 932, 949, certiorari denied (1998), 525 U.S. 1057, 119 S.Ct. 624, citing Strickland,466 U.S. at 689, 104 S.Ct. at 2065.
Under the second prong of the Strickland test, "prejudice" has been defined as "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." Bradley,supra, at paragraph three of the syllabus. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." State v.Bays (1999), 87 Ohio St.3d 15, 27, 716 N.E.2d 1126, 1140, certiorari denied (2000), ___ U.S. ___, 120 S.Ct. 1727.
We also note that the supreme court has concluded that counsel's failure to call an expert and his decision to rely instead upon cross-examination does not constitute ineffective assistance of counsel.State v. Nicholas (1993), 66 Ohio St.3d 431, 436, 613 N.E.2d 225, 230; see State v. Thompson (1987), 33 Ohio St.3d 1, 10-11, 514 N.E.2d 407,417. Further, one court has specifically held that counsel's failure to call an expert to testify about the variables affecting eyewitness identification was speculative in determining that defense counsel violated an essential duty owed to the defendant. State v. Spencer (Apr. 22, 1997), Franklin App. No. 96APA09-1226, unreported.
Chinn argues that his trial counsel was ineffective because he failed to present the testimony of experts on eyewitness identification and mental retardation. He asserts that the state presented testimony from three people who identified Chinn and that there was no other physical or circumstantial evidence linking him to the offense. Chinn argues that had an expert such as Fulero been called to testify, he could have informed the jury of the variables that affect the reliability of eyewitness identification and helped the jury understand that eyewitness identification can be unreliable in some circumstances. He asserts that had an expert such as Everington been called to testify, she could have informed the jury of Washington's mental condition and inability to store and recall memories.
The trial court concluded that Chinn's trial counsel could not be faulted for failing to call experts to testify on the reliability of eyewitness identifications and on mental retardation. The court found that Chinn's case was not a typical identification case where an identification had been made by a victim who had been involved in an incident with an unknown perpetrator for only a brief period of time or by a victim who had been under a high amount of stress.
Fulero's testimony at the evidentiary hearing concerned the following factors that can affect the reliability of eyewitness identifications: the amount of time the eyewitness has to view the perpetrator's face, the presence of a salient detail like a weapon, the amount of fear reported by the eyewitness, cross-race identifications, the effects of mental retardation, the effects of being alcohol-impaired at the time the perpetrator is witnessed, and the acquisition of post-event information.
Three witnesses identified Chinn at his trial. Shirley Cox was not a witness to the crime but identified Chinn as a person who had introduced himself to her almost three weeks after the crime as "Tony" Chinn. She also testified that the "Tony" she had met resembled the police sketch that had been drawn from Washington's descriptions of Chinn.Christopher Ward testified that he had been introduced by his friend, Washington, to another man named "Tony" and had talked to Washington and "Tony" for thirty to forty-five minutes late on the night of the crime. Apparently, Washington and "Tony" drove Jones' car to Ward's house sometime after committing the crime. Ward stated that he had known nothing about the crime at the time he had met "Tony." He learned of the crime later that night, however, when Washington returned to his house and informed him of it. At Chinn's trial, Ward identified Chinn as the "Tony" he had met on the evening of the crime. Ward also gave a description of the vehicle that Chinn and Washington had driven and such description matched other witnesses' descriptions of Jones' vehicle.
The factors about which Fulero testified were not particularly relevant to the testimonies of Cox and Ward. Cox testified that Chinn was in her presence for ten to fifteen minutes. Thus, she apparently had sufficient time to view his face. Ward testified that he had been in Chinn's presence for thirty to forty-five minutes. Thus, he had sufficient time to view his face. Neither Cox nor Ward testified about the presence of any salient detail and neither reported that they had been in fear while in Chinn's presence. Although Cox's race is unknown from the record, both Ward and Washington were black. There was no evidence that Cox or Ward were mentally retarded. There was no evidence that Cox was alcohol-impaired at the time she witnessed "Tony." Ward testified that he had not been drinking or smoking marijuana on the night he had met Chinn. Further, there was no evidence presented that would support the conclusion that either Cox or Ward had received post-event information which would have changed their identifications of Chinn. Thus, pursuant to the record, none of the factors discussed by Fulero were relevant to the testimonies of Cox or Ward.
The main witness against Chinn was Washington. On the night of the crime, Washington was with "Tony" from approximately 7:00 p.m. to midnight, a significant length of time. Further, Washington knew "Tony" before the night of the crime because he had previously met and "partied" with him. In fact, the two were together awhile before they decided to rob someone and ultimately spent the entire evening together. Washington knew that Chinn was carrying a gun before the crime was committed, but it apparently was not visible to him during most of the evening. Washington did not report being in fear at any time during the night. Although he might have experienced fear or stress during the actual crime, he was not the victim of the crime.
Both Washington and Chinn were black. Washington testified that when he had met Chinn on the evening of the crime, Chinn had been drinking alcohol. Washington, who had not had any alcohol before meeting Chinn, then began drinking with Chinn and the two eventually purchased more beer and consumed it before committing the crime. Washington testified that he had felt intoxicated by the time he had arrived at the scene where the crime had been committed. Although Washington might have been alcohol-impaired at the time of the crime, he had not had alcohol at the time he originally saw and recognized Chinn.
There is no evidence that Washington acquired post-event information about the crime that altered his memory. In fact, Detective Lantz testified that at the time Washington gave his first account of the events of that evening, Lantz had not given him any information about the crime. Lantz also said that until Washington had implicated "Tony," investigators had never suspected anyone linked to that name. Further, Lantz testified that Washington's testimony at Chinn's trial had been consistent with his original story. Thus, none of the factors discussed above would have been particularly relevant to Washington's testimony. The only factor that might have been relevant was the effect of mental retardation on Washington's ability to perceive and remember information.
At the post-conviction relief hearing, Everington testified that Washington had suffered from moderate range mental retardation, had had a limited ability to comprehend, had been easily swayed by others, had been eager to please authority figures, could have been easily distracted, had had significant weakness in long-term recall, and had distorted and confused new information. Fulero testified that mentally retarded people show a decreased accuracy rate in making later identifications and are also more suggestible and often have desires to please authority and to hide their mental retardation.
On the other hand, Monta, an experienced criminal attorney, testified that, after meeting Washington, he had thought Washington probably would have passed psychological "muster." He also stated that the case was probably not centered solely on Washington's identification of Chinn because other witnesses who testified had implicated Chinn in the commission of the crime. Although DeVoss testified positively about Washington's characteristics and abilities, we note that she met Washington in April 1989 and thought he was a "blooming idiot" at that time. During her contact with him between April 1989 and 1992, she decided otherwise, but Chinn's trial was in August 1989, so DeVoss most likely would not have been available to testify positively about Washington's characteristics at the time of Chinn's trial.
Lantz testified that Washington had understood questions and had appropriately answered them. He said that in his interactions with Washington, nothing had led him to think that Washington had been mentally retarded or had been unable to give a truthful account of the events in question. Dr. Martin testified that little can be known by looking solely at a person's IQ scores and that IQ scores do not give information about a person's level of adaptive functioning.
Considering all of this evidence, we cannot conclude that there is a reasonable probability that the result of the trial would have been different had Chinn's counsel called experts to testify about eyewitness identification and Washington's mental retardation. The only eyewitness identification factor that was relevant in the case was Washington's alleged mental retardation and the effects of that retardation were disputed. Although Everington could have testified as to her beliefs about Washington, such testimony was contradicted by the testimonies of Monta, Lantz, and Martin.
Further, we have carefully reviewed Washington's testimony at Chinn's trial. His testimony is remarkably coherent and consistent. We do not agree with Everington's testimony that, during Chinn's trial, Washington had been unable to recall important facts from the night of the crime, had not understood questions, and had given inconsistent and inappropriate answers. Although Washington was unable to give times for many of the events during the evening, he testified that he had not been wearing a watch. While Washington was unable to remember some facts about the evening of the crime, such as with which hand Chinn had held the gun, Washington did remember other very specific facts, such as what he had worn on the night of the crime, the general type of clothing that Chinn had worn, that Jones' car had had a digital clock, and that Chinn had been drinking a sixteen ounce "[b]ig mouth Micky" when he had first seen him. Further, although Washington admitted during his testimony that he could not read or write in cursive, we do not believe that such abilities were required for Washington to accurately identify Chinn.
Washington picked Chinn from a photo spread, after not picking suspects from earlier photo spreads that had not contained Chinn's photograph. Thus, although mentally retarded people might be eager to please authorities, assuming Washington was mentally retarded, he must not have been eager enough to please authorities to immediately pick a suspect from the first photo spread or to immediately identify Chinn during the police lineup. Finally, although mentally retarded people might generally have a decreased accuracy rate in making later identifications, such decreased accuracy rate does not mean Washington's identification of Chinn was wrong. In fact, Washington's familiarity with Chinn prior to the night of the crime likely increased his accuracy rate in identifying him. As Martin testified, a person's level of adaptive functioning is not apparent from his IQ scores. The witnesses who came in contact with Washington prior to Chinn's trial thought that, while Washington might not have been especially bright, he would have passed "muster" and that his story was consistent and plausible.
Considering all of the evidence on the record, we cannot conclude that there is a reasonable probability that had Chinn's counsel called experts on eyewitness identification and mental retardation, the result of the trial would have been different. Thus, we will not conclude that the trial court erred in concluding that Chinn's counsel was not ineffective for failing to call experts on eyewitness identification and mental retardation.
The first and second assignments of error are overruled.
 III. THE TRIAL COURT ERRED IN DENYING APPELLANT CHINN'S MOTION TO AMEND HIS POST-CONVICTION PETITION, IN VIOLATION OF MR. CHINN'S RIGHTS AS GUARANTEED BY THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SEC. 9, 10 AND 16 OF THE OHIO CONSTITUTION.
Chinn filed his petition for post-conviction relief on March 14, 1997. We reversed and remanded the trial court's denial of that petition on August 21, 1998. The evidentiary hearing on remand was held on February 10, 2000. On April 3, 2000, Chinn filed his post-hearing brief. The state filed its post-hearing brief on April 27, 2000. On May 12, 2000, Chinn filed his reply to the state's post-hearing brief. Also on May 12, 2000, Chinn filed a motion for leave to amend his post-conviction petition to add two grounds for relief: the state's failure to disclose Washington's juvenile records to Chinn's trial counsel was a violation of Brady v.Maryland, (1963), 373 U.S. 83, 83 S.Ct. 1194 and Chinn's trial lawyer's lack of knowledge of that evidence rendered him unable to provide effective representation to Chinn at trial. The state filed a motion to overrule Chinn's petition for leave to amend his petition for post-conviction relief on May 30, 2000. Chinn replied to the state's motion on June 7, 2000.
The trial court overruled Chinn's motion for leave to amend his petition for post-conviction relief on September 7, 2000, finding that the arguments in Chinn's motion were beyond the scope of the remand from our court.
A trial court has discretion in granting or denying leave to amend a party's motion. Wilmington Steel Products, Inc. v. Cleveland Elec.Illuminating Co. (1991), 60 Ohio St.3d 120, 121-22, 573 N.E.2d 622, 624. Thus, absent an abuse of discretion, we will not disturb the trial court's denial of Chinn's motion for leave to amend his petition. Seeid. To constitute an abuse of discretion, the trial court's action must have been arbitrary, unreasonable, or unconscionable. Id.
Chinn argues that he should have been permitted to amend his petition pursuant to Civ.R. 15(A).
A proceeding on a petition for post-conviction relief is a civil proceeding. State v. Scudder (1998), 131 Ohio App.3d 470, 474,722 N.E.2d 1054, 1057, dismissed (1999), 85 Ohio St.3d 1456,708 N.E.2d 1010. Because the proceeding is statutory, the Rules of Civil Procedure apply unless, by their nature, they would clearly be inapplicable. Civ.R. 1(C).
Civ.R. 15(A) states, in part:
 A party may amend his pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, he may so amend it at any time within twenty-eight days after it is served. Otherwise a party may amend his pleading only by leave of court or by written consent of the adverse party. Leave of court shall be freely given when justice so requires.
 Only complaints, answers, and replies to counterclaims and answers are pleadings. Civ.R. 7(A); see State ex rel. Hanson v. Guernsey Cty. Bd. of Commrs. (1992), 65 Ohio St.3d 545, 549, 605 N.E.2d 378, 382.
While Chinn's motion to amend his petition might have been filed before a responsive pleading was served, his motion was filed after the trial court had already denied his original petition and after we had reversed that ruling and remanded the case for a specific purpose. "[T]he filing of a motion to amend a petition after the court renders judgment denying that petition is without effect." State v. Bays (Jan. 30, 1998), Greene App. No. 96-CA-118, unreported, affirmed (1999), 87 Ohio St.3d 15,716 N.E.2d 1126. We acknowledge that the trial court's judgment had been reversed at the time Chinn filed his motion, but the case was before the trial court for a limited purpose as prescribed by our ruling, which stated:
 Given the information contained within [the Fulero and Everington] affidavits, we find that trial counsel's failure to call any expert witnesses could rise to the level of ineffective assistance of counsel prejudicial to the rights of the defendant. Thus, we conclude that the trial court should have conducted an evidentiary hearing to determine more fully the nature of the testimony of these two witnesses, as well as the strategical reasoning of trial counsel for not presenting this expert testimony.
(Emphasis added.) Chinn, Montgomery App. No. 16764, supra. On remand, the trial court was to conduct a hearing for only the reasons supra. Such ruling was our mandate and the trial court had no authority to extend or vary that mandate. Nolan v. Nolan (1984), 11 Ohio St.3d 1, 3-5,462 N.E.2d 410, 412-414. Thus, the trial court did not abuse its discretion when it overruled Chinn's motion for leave to amend his petition for post-conviction relief. The third assignment of error is overruled.
 IV. THE FAILURE OF THE STATE TO DISCLOSE CO-DEFENDANT MARVIN WASHINGTON'S JUVENILE RECORDS TO TRIAL COUNSEL WAS A VIOLATION OF BRADY V. MARYLAND, 373 U.S. 83 (1963), IN VIOLATION OF MR. CHINN'S RIGHTS AS GUARANTEED BY THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, § 9, 10 AND 16 OF THE OHIO CONSTITUTION.
Chinn argues that the prosecutor's failure to disclose psychological reports, social history reports, neuropsychological reports, and juvenile court personnel evaluations from Washington's juvenile court records constituted a Brady violation. Assuming arguendo, that Chinn did not waive his argument regarding a Brady violation by failing to raise it in his original petition for post-conviction relief, we will address this argument.
The Supreme Court has held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady,373 U.S. at 87, 83 S.Ct. at 1196-1197; see State v. Treesh (2001), 90 Ohio St.3d 460,475, 739 N.E.2d 749, 767. "In determining whether the prosecution improperly suppressed evidence favorable to an accused, such evidence shall be deemed material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." State v.Johnston (1988), 39 Ohio St.3d 48, 529 N.E.2d 898, paragraph five of the syllabus, following United States v. Bagley (1985), 473 U.S. 667,105 S.Ct. 3375.
We cannot conclude that the non-disclosed records were evidence that was material to Chinn's guilt or punishment because we do not believe that there is a reasonable probability that, had the records been disclosed to the defense, the result of the trial would have been different. Chinn's own attorney, Monta, testified at the post-conviction relief hearing that had he had Washington's juvenile records prior to the trial, he "may very well" have had an expert examine Washington to see if his testimony could be impeached. Monta did not say definitively that he would have consulted an expert had he had the records. Further, Monta stated that the case was not centered solely on Washington's identification of Chinn, as other witnesses that testified had identified Chinn as well. Further, as we indicated above, Everington's testimony was contradicted by the testimonies of Martin and Lantz. Thus, because we cannot conclude that the non-disclosed records were material to Chinn's guilt, there was no Brady violation.
The fourth assignment of error is overruled.
The judgment of the trial court will be affirmed.
 ____________ WOLFF, P. J.
BROGAN, J. and YOUNG, J., concur.