DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from a Washington County Common Pleas Court, Juvenile Division, judgment that awarded Washington County Children Services (WCCS) permanent custody of Julie M. Curry, born December 30, 1998, Matthew Curry, born June 16, 2000, and Samuel Curry, born May 2, 2001.
 {¶ 2} Appellant Julie Buckbee, the natural mother of the children, assigns the following errors for review:
First Assignment of Error:
"The judgment of the trial court is against the manifest weight of the evidence."
Second Assignment of Error:
"It was plain error or ineffective assistance of counsel for the trial court to allow the guardian ad litem, who is not an attorney, to act as counsel for the children at trial and question the witnesses."
 {¶ 3} Both the mother and the father of the children suffer from mental retardation. The father has an IQ of 52, placing him in the moderate mental retardation range. The mother has an IQ of 69, placing her in the mild mental retardation range. Both parents lack significant reading skills.
 {¶ 4} The children suffer from developmental delays. Matthew is delayed in some areas as much as 18 months. Samuel is delayed around 7 to 10 months. The parents' mental retardation negatively impacts their ability to care for the children and to appropriately address the children's special needs.
 {¶ 5} In October of 1997, the State of West Virginia received permanent custody of the parties' older child, Kyle, who was born December 8, 1995, due to the parents' inability to appropriately care for the child.
 {¶ 6} On June 6, 2002, WCCS caseworker Anita Meek received a phone call from Ewing School Early Intervention Specialist Debbie Peck. Peck advised that she was at the Curry home and found Matthew's physical condition "to be of great concern." She reported that Matthew had "dark matter dried all upon his face that at first she believed to be chocolate but upon closer review believe[d to be] blood." Peck stated that Matthew's lips were "almost turned inside out and the inside of his mouth also appear[ed] to be full of blood." Meek advised Peck to request the parents to take Matthew to the doctor immediately.
 {¶ 7} Later that day, WCCS caseworker Kathy Nolan followed up on Matthew's condition. Matthew was admitted to the hospital and Dr. Neilson diagnosed Matthew with impetigo. Dr. Neilson also informed Nolan that Matthew was extremely dirty, being "filthy from top to bottom."
 {¶ 8} On June 10, 2002, WCCS filed a complaint alleging the children to be neglected and dependent and requesting the court to grant WCCS temporary custody of the children. On October 31, 2002, WCCS filed an amended complaint requesting permanent custody.
 {¶ 9} At a April 29, 2003 hearing, the father admitted the neglect and dependency allegations. On May 8, 2003, the trial court adjudicated the children neglected and dependent. The court found: (1) both parents suffer from mental impairment; (2) as a result of their impairment, the parents are not adequately able to provide parenting care "no matter how hard they try"; (3) the parents cannot grasp parental concepts despite repeated instruction; (4) since the children's removal, they have displayed "significant improvement, which was not occurring while the children were in the home"; (5) "[t]he parents do not have the mental capacity to work with the children due to their own mental deficiencies"; and (6) the parents lack the ability to read and write and to determine when medication should be given. The court ordered the children to remain in WCCS's temporary custody pending the dispositional phase.
 {¶ 10} On August 21, 2003, the guardian ad litem filed her report. She stated that since the children have been in foster care, they have been in a nurturing and stable environment in which their many developmental delays and needs have been addressed with on-going services. She reported that: (1) a parent aide has attempted to work with the parents, teaching them nutrition, hygiene, medical care, basic parenting skills, and discipline techniques; (2) Mental Retardation and Developmental Delay service staff have offered numerous services prior to the removal and since the removal, but only the father has complied; and (3) both parents were referred to the Adult Literacy program, but the father attended only one class and the mother never participated. The guardian ad litem stated that the Washington County Board of Developmental Disabilities (BDD) staff:
"has marked the apathy and limitations of the parents over the past four years as well. Matthew and Samuel's physical therapist noted in her report dated July 30, 2003 that `both boys need a consistent, nurturing family environment with parents who can spend extra time and effort that the boys need to learn new skills.' [The therapist] also noted that [the mother] seldom attends the therapy sessions, when she did attend she [did] not participate, was not interactive during the session and showed no enthusiasm."
The BDD expressed concern that the parents "do not or at least seem unable to carry over skills learned from one day to another. Often information provided and or covered during one or more sessions has to be re-taught at the next session." The guardian ad litem also reported:
"The professionals working with [the parents] have a keen understanding of their limitations. Thus the skills being taught to them are modified to their level. Unfortunately parenting skills are not always modifiable. Simple and basic task of changing diapers * * *, knowing when to change the diapers, administering medication, providing a safe environment, seeking intervention when needed and supervising the children cannot be compromised. [The mother] has the ability to maintain and apply those skills[;] however she refuses to do so, even with reminders and prompts. [The father] attempts to apply himself, but he must be constantly prompted and reminded."
The guardian ad litem also stated that the mother's interaction with the children "is very poor":
"There has been the rare occasion in which she has openly engaged with the children[;] however it is always short lived. She `parents from the couch,' meaning she remains seated failing to intervene and when she does verbally intervene she does not follow through. [The mother] fails to understand the impact of her `no-shows' and long absences with visitation. When she has visited with the children it appears as if it is an effort to fill some emotional void she suddenly feels versus trying to build/rebuild her relationship with her children."
The guardian ad litem also noted:
"At the permanent custody hearing in October 1997, concerning Kyle[,] professionals testified that the family had initially been receiving in-home services 3 hours a day 5 days a week. That was increased to 3 hours a day 4 days a week with an additional 8 hours 1 day a week. The recommendations at the hearing for in-home intervention were for a minimum of 8 hours a day 7 days a week. That simply is not possible. It wasn't possible then and would be even more difficult now. [The parents] are no longer married and do not live together. Mentoring and supervision do not seem to be enough guidance for this family; it takes hands on intervention and constant redirection with the parents. This is a family with three special needs children and two special needs parents."
 {¶ 11} The guardian ad litem thus recommended that the trial court award WCCS permanent custody of the children. She stated that the "children deserve a stable, safe and nurturing home. The benefits from that type of environment in just over the past year is incredible. * * * * [The parents] do not possess the skills necessary to safely parent their children, even with immeasurable amounts of intervention."
 {¶ 12} On August 21, 2003, the trial court held a hearing regarding WCCS's permanent custody motion. The father testified that he believes the children's best interests will be served by awarding WCCS permanent custody.
 {¶ 13} BDD early intervention specialist Debbie Peck testified that she has worked with the Curry family for about four years. She stated that before the children's initial removal from the home, she focused on teaching the parent's how to maintain a home that is safe for young children. She explained that the parents seemed unable to retain the information that she provided, stating that each time she returned to the home, she had to repeat the same information she had told the parents during her last visit. Peck related her belief that the parents' developmental disabilities hampered their ability to parent the children.
 {¶ 14} Peck stated that since the children have been placed in foster care, they have developed at a faster rate and that no worries remain about the children's safety, health, or personal hygiene. She testified that the children are more sociable and show excitement when the foster mother hugs them. Peck explained that before the children's removal, they did not display such affection with the parents. Peck stated that returning the children to the parents would cause the children to regress, while continuing to keep the children in a safe and stable environment would allow them to progress even further.
 {¶ 15} Ewing School physical therapist Adrienne Nagy stated that she worked with the two boys. Nagy testified that the boys "were severely delayed in their gross motor skills," i.e., walking, running, and jumping. She explained that Matthew, who was 3 years old at the time, and Samuel, who was 2 years old at the time, both displayed gross motor skills of an 18-month old. She stated that Samuel could not jump, Matthew had poor stair climbing skills, and both children had difficulty catching a ball. She stated that at thirteen or fourteen months, Samuel was not sitting up, but that within six to eight weeks after Samuel's removal from his parents' home, he was sitting and standing, and he learned to walk quickly. She believes that Samuel's progress resulted from the foster parents being responsive to his needs. She stated that Samuel did not show such progress while in the parents' home because the parents had difficulty being responsive. Like Peck, Nagy also testified that the parents had difficulty remembering and learning what she tried to tell them. She further stated that it is "beyond [the parents'] capabilities" to provide for the children's special needs.
 {¶ 16} Nagy also stated that the boys showed delayed social skills: "Their development was very slow. They showed a lot of fear; they showed very little facial expression. You know, they didn't smile and engage with people. They were afraid of people. They just didn't know how to interact with other people." Nagy explained that she found it difficult to do physical therapy with the boys because they were afraid and timid. She stated that since the boys have been in foster care, they are more social, they smile, and they want hugs.
 {¶ 17} Nagy related her belief that the children would regress if returned to the parents. She explained that both boys still have developmental delays that need to be addressed and both will require special attention and help. Both children require special education and on-going physical therapy. She stated that the children would benefit from an environment where they can be watched, nurtured, and given special attention.
 {¶ 18} WCCS caseworker Tracy Reichardt testified that she helped the family with the home environment, parenting techniques, referral to other services, and contacted MRDD to see if services could be provided. She also arranged daycare for the children so that the parents could work on their parenting skills and maintain a safe home. She stated that the parents would follow her hands-on teaching, but when she returned the following week, they could not recall what she had taught them the previous week. Brenda Grywalsky, the children's foster mother, stated that when the children first entered the home, only Julie spoke words, but "she wasn't very plain." Matthew and Samuel did not use words but made noises. She testified that since the children have been in her care: (1) Julie talks better; (2) Matthew started saying words, is able to be understood, and is beginning to put two and three words together; and (3) Samuel is repeating words.
 {¶ 19} The foster mother also stated that when thirteen month Samuel arrived in the home, he acted like an infant. He could not hold himself up and he could not sit up. She explained that she bought him a walker, worked with him, and within a few weeks he was sitting up, pulling up, and walking.
 {¶ 20} WCCS caseworker Mary Ann Rollins testified that the case plan required the parents to attend parent education classes. She stated the father attended one, but that the mother "for some reason * * * just chose not to attend."
 {¶ 21} Appellant testified that she believes that if the children are returned to her, she could appropriately care for them.
 {¶ 22} On August 22, 2003, the trial court granted WCCS permanent custody. The court found: (1) all three children are developmentally delayed; (2) when the children first were removed from the home, the children had significant developmental delays that the parents were not addressing; (a) Matthew had a severe communication delay and a gross motor delay; (b) Samuel, at age one, was just beginning to crawl; (c) Julie had difficulty staying on task and communicating with others; (d) all three children lacked social skills; (3) both parents are developmentally disabled and low functioning; (4) WCCS has been involved with the family since February of 1999; (5) WCCS has offered or assisted the parents in getting environmental education, safety education, early intervention assistance, parenting skills, transportation, parenting education, nutritional information, and therapy and assistance to address the children's developmental delays; (6) the parents' disabilities prevent them from adequately parenting the children; (7) the children's early intervention specialist and physical therapist's attempts to train the parents to help the children overcome their delays were unsuccessful due to the parents not being able to retain the information taught from week to week, and as a result, the children made little progress while residing with the parents; (8) the children's development was greatly affected by the parents' own disabilities and limited parenting skills; (9) all three children, while still delayed, have made significant progress since placement in foster care; (10) after the children were removed, the parents separated and ultimately divorced; (11) neither parent presently has an appropriate residence for the children; (12) the mother is unemployed and the father is employed through the local sheltered workshop; (13) neither parent can provide for the children's special needs; (14) both parents have a very limited ability to read; (15) the foster parents have worked hard to help the children lessen their developmental delays and obtain social skills; (16) the children have adapted well to the foster home and the children's special needs are being met; (17) despite WCCS's repeated assistance, the parents are not capable of providing a clean and healthy environment, nor are they able to address the children's developmental delays due to their own mental retardation issues and limited parenting skills; (18) returning the children to either parent would cause a great set back in the children's development; (19) the children need to have a stable and nurturing environment where they can receive help to overcome their developmental delays and permanence in their lives which cannot be achieved without a grant of permanent custody.
 {¶ 23} Appellant filed a timely notice of appeal.
 I {¶ 24} In her first assignment of error, appellant asserts that the trial court's judgment granting WCCS permanent custody is against the manifest weight of the evidence. Specifically, she claims that clear and convincing evidence does not support the trial court's decision that the children's best interests would be served by granting WCCS permanent custody. Appellant further argues that before severing her parental rights, WCCS should have shown that "the methods it used to impart parenting skills to the parents were designed to be effective for people with the parents' developmental disabilities." Appellant contends that WCCS should have demonstrated that due to the parents' intellectual disabilities, it searched for more effective methods to teach or communicate with the parents in a way that would achieve results.
 {¶ 25} A parent has a "fundamental liberty interest" in the care, custody, and management of his or her child and an "essential" and "basic civil right" to raise his or her children.Santosky v. Kramer (1982), 455 U.S. 745, 753, 102 S.Ct. 1388,71 L.Ed.2d 599; In re Murray (1990), 52 Ohio St.3d 155, 156,556 N.E.2d 1169, 1171. The parent's rights, however, are not absolute. Rather, "`it is plain that the natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the pole star or controlling principle to be observed.'" In re Cunningham (1979), 59 Ohio St.2d 100, 106,391 N.E.2d 1034 (quoting In re R.J.C. (Fla.App. 1974),300 So.2d 54, 58). Thus, the state may terminate parental rights when the child's best interest demands such termination.
 {¶ 26} R.C. 2151.413 permits a public children services agency that has temporary custody of a child to file a motion requesting permanent custody of the child. In considering a motion filed pursuant to R.C. 2151.413, the trial court must follow the guidelines set forth in R.C. 2151.414.
 {¶ 27} R.C. 2151.414(A)(1) requires the trial court to hold a hearing regarding the motion for permanent custody. The primary purpose of the hearing is to allow the trial court to determine whether the child's best interests would be served by permanently terminating the parental relationship and by awarding permanent custody to the agency. See R.C. 2151.414(A)(1).
 {¶ 28} When reviewing a motion for permanent custody, a trial court should consider the underlying principles of R.C. Chapter 2151:
"(A) To provide for the care, protection, and mental and physical development of children * * *;
"* * *
"(C) To achieve the foregoing purpose, whenever possible, in a family environment, separating the child from its parents only when necessary for his welfare or in the interests of public safety." R.C. 2151.01.
 {¶ 29} We note that clear and convincing evidence must exist to support a permanent custody award. The Ohio Supreme Court has defined "clear and convincing evidence" as follows:
"The measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal."
In re Estate of Haynes (1986), 25 Ohio St.3d 101, 103-04,495 N.E.2d 23, 26; see, also, State v. Schiebel (1990),55 Ohio St.3d 71, 74, 564 N.E.2d 54, 60. In reviewing whether the lower court's decision was based upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." Schiebel, 55 Ohio St.3d at 74,564 N.E.2d at 60. If the lower court's judgment is "supported by some competent, credible evidence going to all the essential elements of the case," a reviewing court may not reverse that judgment.Id.
 {¶ 30} Moreover, "an appellate court should not substitute its judgment for that of the trial court when there exists competent and credible evidence supporting the findings of fact and conclusion of law." Id. Issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact. As the court explained inSeasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80,461 N.E.2d 1273:
"The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony."
 {¶ 31} R.C. 2151.414(B) permits a trial court to grant permanent custody of a child to a children services agency if the court determines, by clear and convincing evidence, that the child's best interest would be served by the award of permanent custody and that one of the following conditions applies:
"(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
"(b) The child is abandoned.
"(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
"(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.
 {¶ 32} Pursuant to the plain language of R.C.2151.414(B)(1)(d), when a child has been in a children services agency's temporary custody for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, a trial court need not find that the child cannot or should not be placed with either parent within a reasonable time. See, e.g., In re Billingsley, Putnam App. Nos. 12-02-07 and 12-02-08, 2003-Ohio-344; In re Williams, Franklin App. No. 02AP-924, 2002-Ohio-7205; In re Dyal, (Aug. 9, 2001), Hocking App. No. 01CA11. Thus, when considering a permanent custody motion brought pursuant to R.C. 2151.414(B)(1)(d), the only other consideration becomes the best interests of the child. A trial court need not conduct an R.C. 2151.414(B)(1)(a) analysis of whether the child cannot or should not be placed with either parent within a reasonable time. Dyal, supra.
 {¶ 33} R.C. 2151.414(D) requires the trial court to consider specific factors in determining whether the child's best interests would be served by granting the motion for permanent custody. The factors include: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors listed under R.C. 2151.414(E)(7) to (11) apply.[1]
 {¶ 34} In the case at bar, we find ample competent and credible evidence to support the trial court's decision to award WCCS permanent custody of the children. Appellant focuses on the trial court's best interest determination and we will limit our review to whether the trial court properly determined that the children's best interests would be served by awarding WCCS permanent custody. With respect to the first best interest factor, the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child, the trial court found that the parents' mental disabilities inhibit their ability to appropriately interact with the children and to address the children's developmental delays. While the evidence reveals that appellant loves her children, the evidence also reveals that appellant cannot provide the special care and attention that her children deserve. The evidence shows that the foster mother is able to appropriately address the children's developmental delays and to provide the children with the special care and attention that they deserve.
 {¶ 35} Regarding the second factor, the child's wishes, as expressed directly by the child or through the child's guardian ad litem, we note that the guardian ad litem recommended that the trial court award WCCS permanent custody.
 {¶ 36} With respect to the third factor, the child's custodial history, at the time of the permanent custody hearing the children had been in WCCS's temporary custody for just over one year. However, WCCS had been involved in the family's life for approximately four years.
 {¶ 37} The fourth factor, the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency, further supports the trial court's decision to award WCCS permanent custody. The evidence reveals that the children have thrived while placed in the stable and nurturing home of the foster mother. The evidence further shows that the parents have failed to demonstrate that they are capable of or willing to provide the children with a stable and nurturing home where they can flourish. The guardian ad litem, WCCS caseworkers, and the children's physical therapist all stated that the parents are unable to retain information learned regarding maintaining a safe home and addressing the children's developmental delays. They stated that the parents' mental disabilities prohibit them from adequately physically and intellectually providing for the children. Thus, the evidence supports the trial court's finding that a legally secure permanent placement cannot be achieved without a grant of permanent custody to WCCS. Consequently, we agree with the trial court's decision to award WCCS permanent custody.
 {¶ 38} Furthermore, appellant's argument that WCCS should have demonstrated that WCCS specially designed its teaching methods so that individuals with the parents' intellectual capacity could understand them is without merit. Indeed, we find that the record reveals that WCCS employed special teaching methods to assist the intellectually limited parents to understand the skills that the caseworkers and others attempted to teach them. The guardian ad litem stated in her report that the professionals who worked with the parents had "a keen understanding of their limitations" and modified the skills being taught to the parents' level of understanding. The guardian ad litem further stated, however, that "parenting skills are not always modifiable. Simple and basic task of changing diapers * * *, knowing when to change the diapers, administering medication, providing a safe environment, seeking intervention when needed and supervising the children cannot be compromised." The guardian ad litem asserted that appellant has the ability to maintain and apply those skills, but that she refuses to do so, even with reminders and prompts.
 {¶ 39} Our review of the record reveals that WCCS and associated workers provided more than ample services to the parents that were designed to be understood by the parents, but that despite WCCS's efforts, the parents' mental disabilities and lack of initiative rendered them unable or unwilling to provide the special attention that the children need. The evidence shows that the parents were taught, through hands-on methods, basic home maintenance but were unable to retain the information. The parents were provided instructions on how to care for the children, but were unable to follow through with these instructions. Sadly, the parents simply cannot care for the children. They have not shown that they possess the mental capacity to address the children's own developmental delays. Without proper intervention, the children will continue to suffer. The best interests of the children demand that they be afforded a nurturing home where their many developmental delays can be addressed and where they can flourish.
 {¶ 40} Accordingly, based upon the foregoing reasons, we overrule appellant's first assignment of error.
 II {¶ 41} In her second assignment of error, appellant argues that the trial court committed plain error by allowing the guardian ad litem, a lay person, to function as counsel for the children at trial and to question witnesses. Alternatively, she asserts that trial counsel was ineffective for failing to object to the guardian ad litem's role.
 {¶ 42} We initially note that appellant did not object when the guardian ad litem posed questions to any of the witnesses. Thus, we may recognize the error only if it constitutes plain error. See In re Etter (1998), 134 Ohio App.3d 484, 492,731 N.E.2d 694. Courts should exercise extreme caution when invoking the plain error doctrine, especially in civil cases. Thus, courts should limit applying the doctrine to cases "involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process * * *."Goldfuss v. Davidson (1997), 79 Ohio St.3d 116, 122-123,679 N.E.2d 1099. See, also, In re Alyssa C. 153 Ohio App.3d 10, 17,2003-Ohio-2673, 790 N.E.2d 803.
 {¶ 43} R.C. 2151.281(I) sets forth the general duties of a guardian ad litem. The statute provides that the guardian ad litem:
"shall perform whatever functions are necessary to protect the best interest of the child, including, but not limited to,
investigation, mediation, monitoring court proceedings, and monitoring the services provided the child by the public children services agency or private child placing agency that has temporary or permanent custody of the child, and shall file any motions and other court papers that are in the best interest of the child." (Emphasis added.)
 {¶ 44} Thus, the guardian ad litem's duty is to protect the child's interests. In re Myers, Athens App. No. 02CA50, 2003-Ohio-2776 (citing Juv.R. 4(B); R.C. 2151.281(B)(1)). Part of the guardian ad litem's duty is to investigate the child's situation and to ask the court to do what the guardian ad litem believes is in the child's best interest. Id. (citing In re BabyGirl Baxter (1985), 17 Ohio St.3d 229, 232, 479 N.E.2d 257).
 {¶ 45} In Beil v. Bridges (July 13, 2000), Licking App. No. 99CA135, the court was presented with situation similar to that in the case at bar. In Beil, the appellant argued that the trial court allowed the guardian ad litem, who was not an attorney, to engage in the unauthorized practice of law by permitting the guardian ad litem to question witnesses. The court of appeals disagreed and stated: "The guardian was not acting as an advocate representing any of the persons involved in the action, but rather was acting in her role as guardian to assist the court in determining the best interest of the child." But, see, In re Alfrey, Clark App. No. 01CA83, 2003-Ohio-608. The court additionally concluded that the appellant had not demonstrated any prejudice resulting from the guardian ad litem's questioning of the witnesses. The court noted that "[n]one of the information elicited from questioning by the guardian ad litem was substantially different from the evidence before the court that was elicited through questioning by the attorneys."
 {¶ 46} In the case at bar, we need not decide whether the guardian functioned as counsel by questioning witnesses. Instead, we conclude that any error associated with the guardian ad litem's questioning is not plain. Appellant has not established that the guardian ad litem's questioning of witnesses seriously affected the basic fairness, integrity, or public reputation of the judicial process. Consequently, based upon the foregoing reasons, we disagree with appellant that the guardian ad litem's questioning of witnesses constituted plain error and mandates a reversal of the trial court's judgment.
 {¶ 47} Moreover, we conclude that trial counsel did not render ineffective assistance of counsel by failing to object to the guardian ad litem's questioning of witnesses. The right to counsel, guaranteed in permanent custody proceedings by R.C.2151.352 and by Juv.R. 4, includes the right to the effective assistance of counsel. See In re Wingo (2001),143 Ohio App.3d 652, 666, 758 N.E.2d 780 (citing In re Heston (1998),129 Ohio App.3d 825, 827, 719 N.E.2d 93). "`Where the proceeding contemplates the loss of parents' `essential' and `basic' civil rights to raise their children, * * * the test for ineffective assistance of counsel used in criminal cases is equally applicable to actions seeking to force the permanent, involuntary termination of parental custody.'" Id. (quoting Heston).
 {¶ 48} To reverse a trial court's judgment based upon a claim of ineffective assistance, the defendant must show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. See Strickland v. Washington (1984),466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; State v.Noling (2002), 98 Ohio St.3d 44, 65, 781 N.E.2d 88; State v.Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373. Both prongs of this test need not be analyzed if a claim can be resolved under only one of them. See State v. Madrigal (2000),87 Ohio St.3d 378, 389, 721 N.E.2d 52; State v. Loza (1994),71 Ohio St.3d 61, 83, 641 N.E.2d 1082.
 {¶ 49} Counsel's performance may be found to be deficient if counsel "made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687, 538 N.E.2d 373; see, also, Bradley,
paragraph two of the syllabus (stating that counsel's performance is deficient if it falls below an objective standard of reasonable representation); State v. Peeples (1994),94 Ohio App.3d 34, 44, 640 N.E.2d 208 (stating that counsel's performance is deficient if it "raise[s] compelling questions concerning the integrity of the adversarial process"). To establish prejudice, "the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." Bradley, paragraph two of the syllabus; see, also, Strickland, 466 U.S. at 687; Noling;Bradley, paragraph three of the syllabus ("To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different.").
 {¶ 50} Based upon our review of the record, we do not agree with appellant that trial counsel's performance was deficient. Appellant has failed to overcome the strong presumption that trial counsel acted within the realm of reasonable trial strategy and that counsel was competent. Additionally, appellant has not shown how counsel's failure to object to the guardian ad litem's questioning of witnesses prejudiced her or affected the outcome of the trial court's decision to award WCCS permanent custody. Appellant has not, therefore, shown that she received ineffective assistance of counsel.
 {¶ 51} Accordingly, based upon the foregoing reasons, we overrule appellant's second assignment of error and affirm the trial court's judgment.
Judgment affirmed.
Kline, P.J. Harsha, J., Concur in Judgment Opinion as to Assignment of Error I; Concur in Judgment Only as to Assignment of Error II
[1] R.C. 2151.414(E)(7) to (11) provide as follows:
(7) The parent has been convicted of or pleaded guilty to one of the following:
(a) An offense under section 2903.01, 2903.02, or 2903.03 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense was a sibling of the child or the victim was another child who lived in the parent's household at the time of the offense;
(b) An offense under section 2903.11, 2903.12, or 2903.13 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;
(c) An offense under division (B)(2) of section 2919.22 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to the offense described in that section and the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense is the victim of the offense;
(d) An offense under section 2907.02, 2907.03, 2907.04,2907.05, or 2907.06 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;
(e) A conspiracy or attempt to commit, or complicity in committing, an offense described in division (E)(7)(a) or (d) of this section.
(8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.
(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 [2151.41.2] of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.
(10) The parent has abandoned the child.
(11) The parent has had parental rights involuntarily terminated pursuant to this section or section 2151.353
[2151.35.3] or 2151.415 [2151.41.5] of the Revised Code with respect to a sibling of the child.