The STATE of Ohio, Appellee,

v.

PEEPLES, Appellant.

[Cite as *State v. Peeples* (1994), 94 Ohio App.3d 34.]

Court of Appeals of Ohio,
Pickaway County.

No. 92 CA 7.

Decided March 23, 1994.

36

P. *Randall Knece,* Pickaway County Prosecuting Attorney, for appellee.

*Barry L. Wilford,* for appellant.

GREY, Judge.

This is an appeal from a judgment of conviction and sentence entered by the Pickaway County Court of Common Pleas. A three-judge panel found Kavin Peeples, defendant below and appellant herein, guilty of aggravated murder in violation of R.C. 2903.01(A) with specifications pursuant to R.C. 2929.04 (aggravated murder committed while the defendant was an inmate in a detention facility).

At approximately 8:00 a.m. on May 5, 1990, at the Kirk School in the Orient Correctional Institution, Peeples allegedly went to the school, signed himself in and proceeded to the office where fellow inmate Ron McCaman was seated at a computer terminal. Peeples and McCaman had had difficulties in the past. When McCaman asked him about his reason for being there, Peeples walked behind McCaman and strangled him with a cord taken from a laundry bag. Peeples placed McCaman's body in a nearby restroom and returned to his dormitory. At 11:00 a.m., the prison conducted a routine head count of the inmates. When the count did not clear by 11:30 a.m., a recount was ordered. McCaman's body was discovered shortly thereafter in the Kirk School restroom by correction officers.

At the time of McCaman's death, Peeples was assigned to Dormitory 6. The dorm supervisor on that day was Sergeant Michael Fonner. As dorm supervisor, Sgt. Fonner maintained order and provided basic counseling to the dorm's inmates. He was also responsible for both the dorm's first head count and the subsequent recount on May 5, 1990. When the recount in his dorm cleared, Sgt. Fonner released the inmates in his unit. Shortly after releasing the dorm's inmates, Sgt. Fonner was told by other inmates that Peeples was packing his belongings. Finding this behavior unusual, he sent for Peeples.

When Peeples entered Sgt. Fonner's office, he offered Peeples a seat and asked him why he was packing his belongings. Peeples did not immediately respond. Finally, Peeples began talking about his problems with McCaman. Peeples then asked about the reason for the recount. Sgt. Fonner asked Peeples what he thought had happened. Peeples said that he had heard that a dead body had been found at the Kirk School. Sgt. Fonner asked Peeples if he knew anything about it. Peeples said he did not, but began talking again about his troubles with McCaman. Peeples then asked Sgt. Fonner what should he do if he had done something wrong. He advised Peeples that it was always best to tell the truth. He then asked Peeples to tell the truth about what he knew about the dead body at Kirk School. Peeples again asked him what should he do. When Sgt. Fonner repeated his advice about telling the truth, Peeples stated that he

had choked a fellow inmate. Sgt. Fonner notified his supervisors and escorted Peeples to the deputy warden's office.

At the deputy warden's office, Trooper Richard Slater of the Ohio State Highway Patrol advised Peeples of his *Miranda* rights. Peeples acknowledged that he was aware of his rights and signed a waiver form. Trooper Slater then took a taped statement from Peeples. After the taped interview was concluded, Peeples stated off the tape that he left McCaman's body in the restroom to conceal him. Trooper Slater again interviewed Peeples on May 8, 1990. At this interview a written waiver was not executed nor was the session taped. The waiver form, however, does contain an unidentified notation that Peeples had verbally waived his constitutional rights.

At this interview, Peeples appeared very calm, although his voice occasionally quavered and he seemed on the verge of tears. Peeples told Trooper Slater that he had been very depressed about an ongoing conflict with McCaman. He also stated that he had contemplated suicide. During the interview, Peeples would sometimes veer from the subject of McCaman's death and talk about alleged mismanagement at the Kirk School.

Subsequently, on May 9, 1990, Peeples admitted to the institute's Rule and Infraction Board that he had strangled McCaman. Peeples was confined to Frazier Hospital, where he was placed under suicide watch.

On June 15, 1990, the Pickaway County Grand Jury returned an indictment against Peeples charging him with one count of aggravated murder, in violation of R.C. 2903.01(A) with specifications pursuant to R.C. 2929.04.

On May 1, 1991, Peeples filed a motion for an *ex parte* hearing on his request for appropriation of funds for expert psychiatric witnesses and for expenses for these witnesses. The trial court granted Peeples's request for funds, but limited the appropriation to $1,500.

On August 8, 1991, Peeples filed a second request for an *ex parte* hearing, seeking additional funding in the amount of $20,000. The trial court held a hearing on this motion and reaffirmed its earlier order denying appropriations of funds in excess of the $1,500 previously granted.

On January 10, 1992, Peeples's case was heard before a three-judge panel in the Pickaway County Court of Common Pleas. The panel found Peeples guilty of aggravated murder in violation of R.C. 2903.01(A) and of the specifications under R.C. 2929.04. The panel sentenced Peeples to life imprisonment without possibility of parole for a period of thirty years.

FIRST ASSIGNMENT OF ERROR

"The trial court erred to the prejudice of appellant when it overruled appellant's motions to be heard *ex parte* for appropriation of funds for expert witnesses and travel expenses where appellant was indigent and the experts would have assisted in the preparation of the defense. (Entry, filed June 4, 1991; MTS. 194)."

This court has previously treated the issue presented in Peeples's first assignment of error. In *State v. Buckner* (July 24, 1985), Ross App. No. 1112, unreported, 1985 WL 9411, Buckner, an indigent defendant, charged with a violation of R.C. 4511.19(A)(3), moved for a "court order advancing money to engage the services of an expert." The trial court denied this motion and Buckner appealed, alleging that the trial court's denial of the motion was error. On appeal, this court discussed the conflicts in the various Ohio jurisdictions over this issue and held that while R.C. 120.33(A) and 2941.51(A) encompass funds sought to employ an expert witness, R.C. 120.33(A)(4) only requires compensation and expenses that "the court approves," leaving the matter within the discretion of the trial court. We held in *Buckner* that abuse of discretion is the standard for reviewing the decision of the trial court in granting, setting, or denying a defendant's motion for funds to employ an expert witness.

In this case, Peeples argues that the trial court erred when it overruled his motion for an *ex parte* hearing on his request for funds in excess of the $1,500 appropriated by the trial court. He argues that he was entitled to more than one expert and that the trial court was required to appropriate funds sufficient to acquire the services of specific experts.

The United States Supreme Court in *Ake v. Oklahoma* (1985), 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53, held that in a capital case where the defendant raises the insanity defense, the state must provide expert psychiatric assistance so as to provide the indigent defendant with the basic tools of defense. The Supreme Court qualified this holding, however, by cautioning that the obligation of the state is limited to provision of one competent psychiatrist. In *Caldwell v. Mississippi* (1985), 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231, the Supreme Court found there was no denial of due process when the state court refused to fund the hiring of various experts in a capital case when the defendant provided little more than undeveloped assertions that the experts' assistance would be beneficial in support of his motion.

██ Construing *Ake* and *Caldwell* together, we hold that a defendant must show more than a mere possibility of assistance from an expert. A defendant must show a reasonable probability that an expert would aid in his defense, and that the denial of expert assistance would result in an unfair trial. *Little v. Armontrout* (C.A.8, 1987), 835 F.2d 1240, 1244.

The Ohio Supreme Court used a similar rationale in *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, holding in paragraph four of the syllabus:

"R.C. 2929.024 requires the court to provide an indigent defendant with expert assistance whenever, in the sound discretion of the court, the services are reasonably necessary for the proper representation of a defendant charged with aggravated murder. The factors to consider are (1) the value of the expert assistance to the defendant's proper representation at either the guilt or sentencing phase of an aggravated murder trial; and (2) the availability of alternative devices that would fulfill the same functions as the expert assistance sought."

Even though Peeples now contends that the services of three specific psychiatric experts were necessary to testify as to Peeples's mental condition on the dates of May 5–8, 1990, he failed to show the requisite necessity for these particular experts. Defense psychologist, Dr. Newton Jackson, filed an affidavit indicating that Peeples's condition was related to his strangling of his girlfriend in 1987. Jackson said that in 1987 Peeples's condition had been diagnosed by Dr. Thomas Uttley and that it was essential that he be examined by Uttley again. The record indicates that Uttley's fee was $5,000 per day, plus expenses.

■ In his motion and in his brief, Peeples principally argues the requirement for an *ex parte* hearing on his request for appropriation of funds and the need for these experts, *per se*, is only mentioned. While an *ex parte* hearing may be necessary at times to protect counsel's defense strategy, *Ake, supra*, there is no indication that such a hearing was necessary in this case.

■ Applying the factors enumerated above in *Jenkins* to Peeples's requests for three specific experts, we find that the trial court properly limited funding for expert witnesses. Peeples had the benefit of a court-appointed psychiatrist and funds to pay for those services. He was provided with expert assistance sufficient to plead his case. There was no abuse of discretion here. Peeples's first assignment of error is overruled.

SECOND ASSIGNMENT OF ERROR:

"The trial court erred to the prejudice of Appellant when it overruled the motion to suppress statements when such statements were taken in violation of Appellant's right to counsel and against self-incrimination as protected by the Fifth and Fourteenth amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution. (Entry, filed December 12, 1991.)

"(A) The trial court erred to the prejudice of Appellant when it failed to suppress statements made to Sgt. Fonner when Appellant made those statements during a custodial interrogation and without the benefit of Miranda warnings.

"(B) The trial court erred to the prejudice of Appellant when it did not suppress subsequent statements made by Appellant to Tpr. Slater by holding that Appellant's waivers of his Miranda rights were made voluntarily, knowingly and intelligently."

In this assignment of error, Peeples asserts that the trial court erred in failing to suppress the statement made to Sgt. Fonner. Peeples argues that Sgt. Fonner was, *de facto,* a law enforcement officer, and because he failed to give Peeples *Miranda* warnings during their conversation on May 5, 1990, any statements made during that conversation were inadmissible at trial.

Although Peeples does not claim that Sgt. Fonner was a law enforcement officer, *de jure,* he does argue that Sgt. Fonner's position of authority at the prison and peremptory demeanor were such that Peeples, as an inmate, was obligated to comply with Sgt. Fonner's order to come to the office and sit down. Peeples argues that Sgt. Fonner's conduct and questioning constituted interrogation and compelled Peeples's confession. Peeples also claims the conversation he had with Sgt. Fonner was a custodial interrogation and that the trial court erred when it held he was not in custody and that his statements were made voluntarily.

He further contends the trial court should have suppressed his original confession to Sgt. Fonner and his subsequent confession to Trooper Slater, since both confessions were secured without valid *Miranda* waivers.

In *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, the Supreme Court recognized that custodial interrogations by their very nature produce "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Id.* at 467, 86 S.Ct. at 1624, 16 L.Ed.2d at 719. To defeat this inherent compulsion to confess and thereby protect a suspect's Fifth Amendment privilege against self-incrimination, the Supreme Court held that a suspect may effectively waive the rights imbued within the *Miranda* warnings only if the waiver is made voluntarily, knowingly and intelligently. *Id.* at 444, 475, 86 S.Ct. at 1612, 1628, 16 L.Ed.2d at 706, 724.

Peeples argues, and the state concedes, that he was in custody at the time he engaged Sgt. Fonner in conversation. In this case, we must decide whether the conversation with Sgt. Fonner amounted to custodial interrogation, *i.e.,* whether it was merely a conversation or an interrogation for *Miranda* purposes.

This court has twice previously considered whether a prison inmate has been subjected to custodial interrogation for *Miranda* purposes. In *State v. Bradley* (Sept. 21, 1987), Scioto App. No. 1583, unreported, 1987 WL 17303, we held that the applicable test of custody or restriction in the prison context necessarily

implies a change in the surroundings of the prisoner which results in an added imposition on his freedom of movement and whether an inmate is in custody under *Miranda* depends on the circumstances of the case. See *Cervantes v. Walker* (C.A.9 1978), 589 F.2d 424; *United States v. Conley* (C.A.4, 1985), 779 F.2d 970. See, also, *United States v. Cooper* (C.A.4, 1986), 800 F.2d 412.

Two years later, in *State v. Swinney* (July 17, 1989), Pickaway App. No. 87–CA–41, unreported, 1989 WL 86260, we held that when Swinney, a rape suspect, was questioned by the prison officials, he had already become the focus of a criminal investigation. We noted that it was not so much the status of corrections officer as a law enforcement officer but the circumstances such as the coercive effect or restrictions on movement even within the limited liberties of a prison setting. We held that the psychological pressures placed upon a suspect during an interrogation in the correction officer's office were the same as those placed upon any suspect who is questioned in a police station.

Unlike the facts in *Swinney*, however, Peeples had not yet become the focus of a criminal investigation when he was summoned to Sgt. Fonner's office, and was summoned only because he was behaving unusually by packing his belongings. He was not asked to come to the office as a suspect, because at that time Sgt. Fonner was as yet unaware that McCaman had been killed. Peeples was not confined to Sgt. Fonner's office. He was free to return to his cell once he answered the question Sgt. Fonner presented to him. Unlike the facts in *Swinney* where the suspect was already confined to security control when he was first interrogated by prison officials, Peeples was in the general population. When he made the admissions to Sgt. Fonner, he was then escorted to the deputy warden's office, a clear indication of the change in his custodial status. Thereafter, he was treated in accord with his custodial status, and on being advised of his *Miranda* rights, he admitted that he had killed McCaman.

It is apparent from these facts that Peeples did not suffer a "restriction in his freedom over and above that in his normal prison setting." *Bradley, supra.* Although Peeples was in custody when he talked to Sgt. Fonner, the conversation did not rise to the level of a custodial interrogation. When it did reach the level of custodial interrogation, he was advised of his rights.

■ Peeples also argues that his properly warned confession to Trooper Slater must be suppressed because it was preceded by an earlier unwarned but completely voluntary admission. He asserts that despite the careful and thorough administration of *Miranda* warnings, such efforts do not cure the condition that rendered the unwarned statement inadmissible.

In *Oregon v. Elstad* (1984), 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222, the Supreme Court considered a similar challenge and held that "[i]t is an unwarrant-

ed extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. * * * Endowing the psychological effects of *voluntary* unwarned admissions—such as the psychological impact of the suspect's conviction that he has 'let the cat out of the bag'—with constitutional implications would, practically speaking, disable the police from obtaining the suspect's informed cooperation even when the official coercion proscribed by the Fifth Amendment played no part in either his warned or unwarned confession." (Emphasis added.) *Id.* at 298–299, 105 S.Ct. at 1287–1288, 84 L.Ed.2d at 225.

The court reasoned that there is a vast difference between a confession coerced by physical violence or other methods which are calculated to break the suspect's will and the disclosure of a guilty secret freely given in response to an unwarned but non-coercive question. There is no indication in the record of any coerciveness nor any indication the initial inquiry of Sgt. Fonner was anything more than his routinely checking on what was going on with the people in the section over which he had supervisory responsibility.

Based on the foregoing, Peeples's second assignment of error is not well taken and is overruled.

THIRD ASSIGNMENT OF ERROR

"Defendant was denied the right to effective assistance of counsel by failure to challenge the admissibility of inculpatory statements when competent evidence was known and available to counsel that defendant lacked the mental capacity to effectuate a valid waiver of right to silence and right to counsel. U.S. Constitution Amendment VI; Ohio Constitution Article I, Section 10."

In this final assignment of error, Peeples asserts that he was denied effective assistance of counsel because trial counsel failed to raise and argue a valid basis for a motion to suppress the inculpatory statements made to Sgt. Fonner. Peeples argues that trial counsel's failure was egregious oversight and gross neglect warranting reversal. We do not agree.

The United States Supreme Court in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, held that every person charged with a criminal offense shall be afforded effective assistance of counsel for his defense. The court set forth a two-prong test to assess the effectiveness of counsel.

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the

defendant. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction resulted from a breakdown in the adversary process that renders the result unreliable.

In *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, the Ohio Supreme Court discussed *Strickland v. Washington* and the holding in *State v. Lytle* (1976), 48 Ohio St.2d 391, 2 O.O.3d 495, 358 N.E.2d 623, and developed a two-step process to assess the effectiveness of counsel. First, there must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties to his client. Next, and analytically separate from the question of whether the defendant's Sixth Amendment rights were violated, there must be a determination as to whether the defense was prejudiced by counsel's ineffectiveness.

We must first determine whether Peeples's counsel's performance fell below an objective standard of reasonableness or competence. Peeples claims that his trial counsel's efforts to suppress the confession were both protracted and ineffectual. He also complains that his trial counsel failed to call Drs. Uttley and Jackson to testify as to his mental incapacity to make a valid knowing and intelligent waiver of his right to remain silent and his right to counsel. Peeples alleges that his trial counsel's performance fell below the standard of reasonableness and deprived him of the effective assistance of counsel guaranteed under the Sixth Amendment. We do not agree.

A reviewing court will presume that the defense counsel adequately represented his client's interests. *Vaughn v. Maxwell* (1965), 2 Ohio St.2d 299, 31 O.O.2d 567, 209 N.E.2d 164; *State v. Williams* (1969), 19 Ohio App.2d 234, 48 O.O.2d 364, 250 N.E.2d 907. Both *Strickland* and *Lytle* place the burden of proving ineffective assistance of counsel squarely upon the defendant.

Under *Strickland,* the primary consideration is whether defense counsel's performance was such as to raise compelling questions concerning the integrity of the adversarial process. We are not concerned with whether the defendant had a good relationship with his counsel, or had the counsel of his choice, or even whether an isolated instance of defense counsel's performance fell below the standard of professionally acceptable conduct. See *Wheat v. United States* (1988), 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140. Rather, we must determine whether the defendant received a fair trial. The defendant must show that defense counsel's performance resulted in an actual breakdown of the adversarial process. *United States v. Cronic* (1984), 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657. Defense counsel's performance must be so deficient as to deprive the defendant of a fair trial. *Messer v. Kemp* (C.A.11, 1985), 760 F.2d 1080.

■ Defense counsel's performance is deficient if it falls below an objective standard of conduct which is reasonable under prevailing professional norms. However, professional norms are but guidelines because it is impossible to anticipate every circumstance or situation which might arise before and during trial. Generally, counsel's performance falls below the norm if he fails to advocate the defendant's cause, fails to keep the defendant informed of important developments, or fails to use the requisite level of skill necessary to ensure the integrity of the adversarial proceedings.

■ An error of counsel, however, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. The defendant must show that he was prejudiced by the error. Prejudice occurs when the deficiency raises substantial questions about the reliability of the outcome of the trial.

■ Peeples raises two grounds for his ineffective assistance of counsel claim. First, Peeples argues that his trial counsel failed to effectively raise and argue a valid basis for the motion to suppress the inculpatory statements. This meets the second part of the test because, without question, a client is prejudiced if his lawyer fails to obtain the suppression of a confession which ought to have been suppressed.

Peeples concedes that his trial counsel attempted to raise the issue of his mental incapacity into the suppression hearing record, but that trial counsel's proffer of the testimony of Drs. Uttley and Jackson was a nullity. Peeples contends that his trial counsel should have called Drs. Uttley and Jackson to testify. We find that trial counsel adequately presented the question of mental capacity to the trial court on the motion to suppress. The problem facing trial counsel was not establishing Peeples's mental status, but the problem of overcoming the effect of the decision in *Colorado v. Connelly* (1986), 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473.

In *Connelly,* in August 1983 the accused walked up to a policeman and told him he had flown from Boston to Denver and wanted to confess to a murder he had committed there some months before. The policeman immediately advised of him of his right to remain silent, but Connelly insisted he wished to confess. Another police officer was called and he again advised Connelly of his rights. They then arrested Connelly and took him to the police station.

There he was again given full warnings, which he waived before confessing to the murder. Connelly said he was confessing because he was following the voice of God. The confession appeared to be reliable and related to the body of an unidentified female found in April 1983. Connelly claimed to have killed her in November 1982 and took the police officers to where he said the murder took

place. The next day he was behaving oddly and was sent to a state hospital for evaluation.

After being charged with the murder, Connelly filed a motion to suppress, arguing that his waiver of rights was not free and voluntary but a decision impaired by his mental illness. A psychiatrist testified that when Connelly confessed he was in a psychotic state that interfered with his ability to make free and rational choices. However, the psychiatrist testified that Connelly understood his rights as explained by police. The Colorado courts suppressed the confession on the grounds that it was not voluntary, not the product of a free will, but the United States Supreme Court held that it was not constitutionally required to suppress Connelly's confession.

The decision in *Connelly* has been criticized by many, including the dissenting Justices Brennan and Marshall and one commentator who said the Supreme Court "now admits confessions by lunatics." The split in opinion revolves around the purpose of suppressing some confessions.

The majority relied on the sanction rationale, holding that where there has been no improper police conduct, imposing the sanction of suppression is futile or counterproductive particularly where the confession appears to be reliable. Suppression of evidence is a judicially created sanction which is used where law enforcement authorities have overreached their legitimate authority so that a deprivation of constitutional rights occurs. The purpose of excluding or suppressing evidence obtained in violation of constitutional rights is to deter future violations. *United States v. Leon* (1984), 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677.

The minority relied on voluntariness and reliability as the standard, as noted in Justice Brennan's dissent in *Connelly*, 479 U.S. at 178, 107 S.Ct. at 527, 93 L.Ed.2d at 491:

"Until today, we have never upheld the admission of a confession that does not reflect the exercise of free will."

The minority thought that unless the suspect is sane his statement can never be truly voluntary, and involuntary confessions can never be truly reliable.

The grounds for the motion to suppress filed by Peeples is the same as found inadequate in *Connelly*, *i.e.*, mental incapacity as it affects the waiver of rights. Peeples has not alleged that he was coerced by the police to confess. Peeples was given his *Miranda* rights and, therefore, the sanction rationale of *Miranda* is no basis to suppress his statements.

 Peeples, however, argues that he was not competent to knowingly and voluntarily waive his constitutional rights against self-incrimination by reason of

his mental illness. Peeples's history of mental instability is unquestioned. He claims that his mental condition impaired his judgment and caused him to make statements grossly against his own interests.

The admissibility of any confession in Ohio is still based on the idea of voluntariness. *State v. Barker* (1978), 53 Ohio St.2d 135, 7 O.O.3d 213, 372 N.E.2d 1324. In determining the voluntariness of a confession, "the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Smith* (1991), 61 Ohio St.3d 284, 288, 574 N.E.2d 510, 515. Mental capacity would also be an element of the totality of circumstances.

It is important to point out here that we are not deciding the appropriateness of *Connelly, supra,* to this case or any case in Ohio. The issue in this assignment of error is the competence and effectiveness of trial counsel. Our review of the record indicates that counsel provided the trial court with adequate evidence about Peeples, his mental condition, his ability to understand and so on, so that the court could consider these circumstances along with all the circumstances on the issues of voluntariness and knowing and intelligent waiver.

We find that trial counsel's failure to call Drs. Uttley and Jackson as witnesses at the suppression hearing did not constitute either the deficient performance of counsel or constitute the resulting prejudice required by *Strickland* or *Lytle, supra,* such as to support a finding of inadequate assistance of counsel.

Assignment of error three is not well taken and is overruled. Based on the foregoing, the decision of the trial court is affirmed.

*Judgment affirmed.*

PETER B. ABELE and STEPHENSON, JJ., concur.