[Cite as *In re E.B.*, 2012-Ohio-2231.]

IN THE COURT OF APPEALS FOR GREENE COUNTY, OHIO

IN THE MATTER OF E.B., B.B., L.B., Jr.    :

  :       C.A. CASE NO.    2011 CA 13
               2011 CA 14

  :

        T.C. NO. N40828
  :            S42506

  :       (Civil appeal from Common
          Pleas Court, Juvenile Division)

  :

. . . . . . . . . .

**O P I N I O N**

Rendered on the    18th    day of    May   , 2012.

. . . . . . . . . .

NATHANIEL R. LUKEN, Atty. Reg. No. 0087864, Assistant Prosecuting Attorney, 61 Greene Street, Xenia, Ohio 45385
      Attorney for Plaintiff-Appellee

PAMELA L. PINCHOT Atty. Reg. No. 0071648, Clyo Professional Center, 7960 Clyo Road, Centerville, Ohio 45459
      Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, J.

{¶ 1}    Iva C. appeals from two judgments of the Greene County Court of

Common Pleas, Juvenile Division, which granted permanent custody of three of her children E.B., B.B., and L.B. to the Greene County Children Services Board ("CSB"). For the following reasons, the trial court's judgments will be affirmed.

I.

{¶ 2}     Iva is the mother of five children. Her two oldest children, B.B. (born in 1999) and L.B. (born in 2001), were fathered by Larry B. The paternity of Iva's two middle children, A.C. (born in 2005) and J.B. (born in 2009) is unknown. In September 2010, Iva and Larry's third child, E.B., was born.

{¶ 3}     We set forth the history of the family's involvement with CSB until September 2010 in *In re B.B., L.B., J.B., and A.C.*, 2d Dist. Greene No. 2010-CA-68, 2011-Ohio-2679, and we repeat it here.

In December 2008, B.B., L.B., and A.C. were removed from their home and placed in the temporary custody of Children Services, which has been involved with the family since 2003. The reasons they were removed were primarily [Iva's and Larry's] drug abuse that has resulted in their failure to be adequate parents. On the morning of January 3, 2009, J.B. was born with a high level of cocaine in her system. Later that day, J.B., too, was placed in Children Services' temporary custody. The following month, the children were adjudicated dependent. See R.C. 2151.04 (defining "dependent child"). The children were placed in foster homes, and Children Services developed a case plan for the family. The plan required [Iva] to stop using drugs, be assessed for substance abuse and mental heath treatment and

comply with any recommendations, submit to random drug screens, complete parenting classes, and visit with her children.

Nine months later, in November 2009, Children Services moved to secure permanent custody of the children. A hearing took place in the juvenile court [in March 2010,] at which Children Services presented the testimony of several witnesses. The testimony revealed that, since she lost custody of her children, [Iva] had failed to complete treatment for drug abuse, despite being assessed and reassessed multiple times and each time being recommended for treatment. Testimony further revealed that random drug screens over the preceding 14 months showed that [Iva] continued to use drugs. [Iva] had, though, completed parenting classes and visited with her children. The result of this first motion for permanent custody was that the juvenile court denied Children Services' motion, determining that permanent custody was not in the children's best interest. While [Iva] had not fully complied with her case plan, said the court, she had achieved some of the plan's goals, and she was interested in achieving full compliance. The court said that it would give [Iva] an opportunity to demonstrate her full commitment to her children.

Two months later, in May 2010, Children Services again moved to secure permanent custody. A hearing took place in September 2010. At the start of the hearing, the parties agreed that, in making its determination, the court could consider the evidence that was presented at the March hearing. Children Services then presented the testimony of several witnesses. J.B.'s

foster mother, K.S., testified about the extent of J.B.'s significant medical issues.  * * *

The court also heard testimony from [Iva]'s caseworker and social worker.  They testified that, since the first permanent-custody hearing, [Iva] had continued to test positive for drugs.  In the six months between the hearings, [Iva] was clean only three times.  They further testified that [Iva] failed to submit to a majority of the drug screens that Children Services tried to administer.  A case aide testified that on at least two occasions [Iva] simply refused to be screened and admitted that a drug test would be positive. As recently as the month before the September hearing, [Iva]'s caseworker testified, she submitted to only four of the nine drug screens requested.  And all four came back positive – one showing that [Iva] had recently used cocaine.  At the time of the hearing, [Iva] was pregnant with her fifth child.

The court further heard that [Iva] had still not completed treatment for her drug abuse.  Since the March hearing, [Iva] was assessed twice more at TCN Behavioral Health Center, and each time she was recommended for treatment but never completed it.  Also, [Iva] again got into Women's Recovery Center[, a residential drug and alcohol rehabilitation facility,] and was supposed to be admitted on August 25, 2010.  She was not admitted, though, because she had tested positive for a drug cocktail of benzodiazapine, marijuana, and cocaine.

There was also testimony that [Iva]'s drug abuse has resulted in a

decrease of visits with her children. Sometimes she did not show up. More often, the caseworker canceled visits because [Iva] had tested positive for drugs.

This time, [in September 2010,] the juvenile court granted Children Services' motion, at least in part. The court determined that permanent custody was not in the best interest of B.B. and L.B. and with respect to them denied the motion. [The court told CSB, however, that it need not make reasonable efforts toward reunification of B.B. and L.B. with Iva and should focus, instead, on reunification of those children with Larry. Larry's case plan was to be amended to include a goal that he obtain stable housing without Iva.] But permanent custody was in the best interest of A.C. and J.B., the court determined, and it granted the agency's motion accordingly. *In re B.B.* at ¶ 2-8.

**{¶ 4}** We affirmed the trial court's decision to grant permanent custody of A.C. and J.B. to CSB. *Id.*

**{¶ 5}** E.B., Iva and Larry's youngest child, was born in September 2010. CSB obtained emergency custody of E.B. on the day following his birth and filed a complaint for dependency; the court subsequently granted interim custody of E.B. to CSB. An amended dependency complaint, seeking permanent custody, was filed in October 2010.

**{¶ 6}** In December 2010, CSB again moved for permanent custody of B.B. and L.B., alleging that Iva had not complied with the case plan, continued to test positive for drugs, and often refused drug screens. The agency further alleged that, although Larry had

moved in with his father for a period of time, he had returned to living with Iva and had positive and negative drug screens since the last court hearing.

{¶ 7} On February 1, 2011, the trial court held a hearing on CSB's request for permanent custody of E.B. CSB presented testimony from Larry's father; Jamie Trent, Iva's postpartum nurse at Miami Valley Hospital following E.B.'s birth; Iva's former and current CSB caseworkers, Domonique Paige and Jessica Ryan; and Dr. Esther Battle, who evaluated Iva. CSB also called Larry and Iva. The State also offered six exhibits consisting of Dr. Battle's evaluation report, case plans, Larry's January 2011 drug test results, and correspondence from CSB to Iva and Larry. Iva did not call any witnesses on her behalf.

{¶ 8} On February 8, 2011, the trial court held a hearing on CSB's motion for permanent custody of B.B. and L.B. The parties agreed that the trial court could consider the evidence and testimony presented at the September 2010 hearing on CSB's prior motion for permanent custody, which also included the evidence from the March 2010 hearing. As stated by the Iva's counsel, the February 2011 hearing would "talk about what has happened since September." The State then presented testimony from Larry's father, Larry, Iva, Paige, Ryan, and the foster mother of B.B. and L.B.

{¶ 9} In two separate decisions, the trial court granted permanent custody of L.B., B.B., and E.B. to CSB. Based upon the testimony and exhibits presented by CSB at the February 1 hearing, the trial court found, in part, that despite reasonable care planning and diligent efforts by the agency to assist the parents, "the parents have failed continuously and repeatedly to substantially remedy the conditions causing the child [E.B.] to be placed

outside his home." The court further found that E.B. could not be placed with either parent within a reasonable period of time, and that it was in E.B.'s best interest to be placed into CSB's permanent custody. The court noted that the guardian ad litem had recommended permanent custody to CSB and that Dr. Battle had opined that "Iva is not capable of responding empatheticly [sic] to her children's needs; she is not able to safely and effectively care for her children."

{¶ 10} The trial court's decision regarding B.B. and L.B. focused primarily on Larry. The court noted that it had ruled in its September decision that "the agency was no longer required to make reasonable efforts to reunite the children with [Iva], and directed the agency to focus reunification efforts solely with [Larry]." The court's decision stated, however, that Iva "continues to use marijuana and cocaine" and that her "continued drug abuse renders the home unstable and unsafe for the children." The court further found, as related to Iva, that both parents had failed to complete substance abuse treatment, that both parents are participating in mental health counseling, and that both successfully completed parenting class, although "[a]t a few of the classes, the presenter detected an odor of alcohol coming from them." The court further found, in part, that the children were developing emotional ties to their foster parents, that the children could not be placed with either parent within a reasonable time, that the agency had made reasonable efforts to "eliminate the continued removal of the children from their home," and that it was in B.B.'s and L.B.'s best interest to be in CSB's permanent custody.

{¶ 11} Iva raises two assignments of error on appeal.[1] We will address them in

---

[1] Larry did not appeal the trial court's judgments, and in January 2012, this court was notified that Larry had died.

reverse order.

III.

{¶ 12} Iva's second assignment of error states:

THE TRIAL COURT ERRED WHEN IT OVERRULED TRIAL COUNSEL'S HEARSAY OBJECTION AS TO EVIDENCE OF APPELLANT'S DRUG TESTS.

{¶ 13} In her second assignment of error, Iva claims that the trial court erred in permitting her caseworker, Domonique Paige, to testify at the hearing regarding E.B., over her objection, to the results of drug tests taken between July 2010 and January 2011.

{¶ 14} Evid.R. 801(C) defines hearsay as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." A "statement," as included in the definition of hearsay, is an oral or written assertion or nonverbal conduct of a person if that conduct is intended by the person as an assertion. Evid.R. 801(A). "An assertion, for hearsay purposes, is a statement about an event that happened or a condition that existed." *In re K.B.,* 10th Dist. Franklin No. 06AP-04, 2006-Ohio-5205, ¶ 23, citing *State v. LaMar,* 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 61.

{¶ 15} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Haines*, 112 Ohio St.3d 393, 2006-Ohio-6711, 860 N.E.2d 91, ¶ 50. However, "[a] trial court's discretion to admit or exclude relevant evidence does not include the discretion to admit hearsay; Evid.R. 802 mandates the exclusion of hearsay unless any exceptions apply." *In re Lane*, 4th Dist. Washington No.

02CA61, 2003-Ohio-3755, ¶ 11.

{¶ 16} One exception to the hearsay rule is the "business records" exception in Evid.R. 803(6), which provides that the following evidence is not excluded by the rule against hearsay:

> Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, *all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10),* unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit. (Emphasis added.)

{¶ 17} "'To be admissible under Evid.R. 803(6), a business record must display four essential elements: (1) it must have been kept in the regular course of business; (2) it must stem from a source who had personal knowledge of the acts, events, or conditions; (3) it must have been recorded at or near the time of the transaction; and (4) a foundation must be established by the testimony of either the custodian of the record or some other qualified person.'" *Royse v. Dayton*, 195 Ohio App.3d 81, 2011-Ohio-3509, 958 N.E.2d 994, ¶ 25 (2d Dist.), quoting *State v. Comstock*, 11th Dist. Ashtabula No. 96-A-0058, 1997 WL 531304

(Aug. 29, 1997). *See State v. Jones*, 2d Dist. Montgomery No. 24077, 2011-Ohio-3275, ¶ 12 (noting that Evid.R. 803(6) had an authentication requirement that must be met before the rule applies).

{¶ 18} In *Royse*, we addressed the admissibility of a firefighter's positive drug test results in a hearing before the Civil Service Board, which had chosen to follow the Ohio Rules of Evidence. Witnesses at that hearing described the process for random drug testing. They indicated that urine samples were collected, sealed, and then shipped to a laboratory in Memphis, which performed tests on the samples to determine whether the samples contained drugs. The laboratory then sent the results of the tests to a company in Michigan, and a medical-review officer of the Michigan company then reviewed the results to determine whether the test results were positive or negative for the presence of certain drugs. If the results were positive, the medical-review officer would contact the employee and send the results to the safety administrator for the city of Dayton. At the hearing, the city of Dayton produced the reports of the medical-review officers, but no person testified regarding the methodology of the tests performed by the laboratory or the results of those tests. Further, no person testified on behalf of the Michigan company regarding what particular data the medical-review officer reviewed or why the officer concluded that the firefighter's test results were positive for cocaine. The Civil Service Board accepted the laboratory results and affirmed the firefighter's discharge. The trial court affirmed the board's decision.

{¶ 19} On review, we held that the trial court erred in considering the drug test results. We initially noted that it was undisputed that the results were hearsay, because they

were offered for the truth of the matter asserted, i.e., that the firefighter had tested positive for cocaine. We concluded the business record exception did not apply, because "'[t]he information in reports that a business receives from outside sources is not part of its business records for the purposes of Evid.R. 803(6).'" *Royse* at ¶ 26, quoting *Babb v. Ford Motor Co.*, 41 Ohio App.3d 174, 177, 535 N.E.2d 676 (8th Dist.1987). We thus held that the city of Dayton could not establish that the medical-review officer's records were its own business records admissible under Evid.R. 803(6). We further stated that the city's witnesses did not properly authenticate the document and "there is no evidence of record demonstrating that the documentary evidence of positive test results and the ultimate conclusions reached therefrom were trustworthy." *Id.* at ¶ 30. (We note that the Supreme Court of Ohio has accepted review of *Royse*. *Royse v. Dayton*, *11/16/2011 Case Announcements*, 2011-Ohio-5883.)

{¶ 20} CSB "concedes that the trial court erred with regards to the admissibility of Appellant's drug screen results." CSB asserts, however, that this error was harmless, because the drug screen results were cumulative to an "overwhelming amount of properly admitted evidence regarding [Iva's] continued drug use and repeated failures at drug treatment."

{¶ 21} Iva claims that the trial court should have excluded Paige's testimony regarding her drug screen results during the permanent custody hearing regarding E.B. Paige testified that Iva's family had been involved with CSB since December 2008 due to concerns about drug abuse by both parents. Paige became the ongoing caseworker in July 2010. During her testimony, she discussed various drugs screens taken by Iva. Paige

testified that Iva was asked to take seven drug screens in July 2010; Iva completed two. Iva tested positive for marijuana on July 12 and was negative for drugs on July 21. In August, seven drug screen were requested, of which Iva performed four. On August 3, Iva was positive for cocaine; on August 9 and 16, she was positive for marijuana and benzodiazepine; and on August 23, she was positive for marijuana.

{¶ 22} Paige further testified that in September, Iva was asked to do six drug screens; Iva did one. Paige did not have the results of that screen. Paige indicated that Iva refused to be tested once in September, and the case aide did not see Iva on the other four occasions. The tests performed in July through September were conducted by the juvenile court. Paige testified that Iva had been asked to perform drug screens for CSB in November, December, and January, but Paige was not permitted to testify about the results of those screens.

{¶ 23} Notwithstanding Paige's testimony regarding the drug screen results, there was substantial additional testimony regarding Iva's drug use at the February 1 hearing. Iva admitted during her testimony that, while she was pregnant with E.B., she had gone to Women's Recovery but "had a positive drug screen, and I got kicked out from there." When asked if she denied that she has been using drugs since CSB became involved with her family, Iva responded, "No, I don't."

{¶ 24} Larry's father testified that he had known Iva for 14 or 15 years and that she had been using drugs during "maybe the last three children she had" prior to E.B.; he had not seen her use drugs within the last three months. Larry testified that Iva had attempted drug rehab in the past and had been unsuccessful. Trent, Iva's nurse in the mother/baby unit of

Miami Valley Hospital after E.B.'s birth, testified that she was "afraid that [Iva] may have been taking her own [Xanax] on top of what we were giving her." Trent testified that Iva was "very sedated; very sleepy, and at times when we would ask her things she would have trouble waking." Trent also found Iva sleeping or passed out on the floor; Trent had "never had that happen before."

{¶ 25} Dr. Battle also testified to Iva's drug history, as reported by Iva. Dr. Battle stated:

> Currently she acknowledged problems with cigarettes, at the time of my evaluations last summer she admitted to smoking a pack and a half a day which was down from two and a half packs. She also acknowledged having off and on throughout the years did acknowledge some use of cocaine but minimized her use of them, according to the records.
>
> For example, she stated during her background history that she had used drugs, cocaine I think she said once when she was pregnant with [J.B.] * * *.

{¶ 26} Jessica Ryan, Iva's caseworker since January 2011, testified that Iva had taken drug screens and she had never denied using drugs while Ryan was the caseworker.

{¶ 27} Based on all of the evidence presented at the February 1 hearing concerning E.B., we agree with CSB that any hearsay evidence regarding Iva's drug screen results was harmless. Even without the results, there was substantial evidence that Iva had been abusing drugs for many years and had not yet successfully completed drug treatment. Iva admitted during her testimony that she uses drugs, Larry and his father testified that she had

a history of drug use, and Dr. Battle and Iva's caseworkers testified that Iva had reported to them that she had abused drugs. Iva had expressed to several people that she needed to get "clean" and Ryan, Iva's caseworker at the time of the February 1 hearing, testified that Iva had never denied using drugs during Ryan's involvement with the case. Even without the exact results of Iva's drug screens, there was substantial evidence to prove that Iva had an admitted lengthy history of drug abuse, that she had not yet successfully completed drug treatment, and that Iva lacked the ability to parent in the best interest of her children. In short, there was sufficient non-hearsay evidence to support the trial court's judgment granting permanent custody of E.B. to CSB.

{¶ 28} Iva's second assignment of error is overruled.

III.

{¶ 29} Iva's first assignment of error states:

THE APPELLANT WAS DENIED HER RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE HER TRIAL COUNSEL FAILED TO OBJECT ON HEARSAY AND LACK OF FOUNDATION TO INADMISSIBLE EVIDENCE OF DRUG TESTS AND EVIDENCE OF PSYCHOLOGICAL TESTS OFFERED BY AN EXPERT.

{¶ 30} In her first assignment of error, Iva claims that her trial counsel rendered ineffective assistance in two respects. First, she argues that he acted deficiently when he failed to object to evidence regarding Iva's drug test results. She argues that the drug test results constituted hearsay and did not satisfy the "regularly conducted activity" hearsay exception. She further asserts that there was no foundation for such evidence. (To the

extent that such evidence was admitted during the March and September 2010 hearings, we presume that Iva is asserting that her counsel was ineffective in stipulating to the court's consideration of that evidence.) Second, Iva claims that her trial counsel was deficient when he failed to object to Dr. Battle's opinions on the ground that Dr. Battle's opinions were not made within a reasonable degree of psychological certainty.

{¶ 31}  The right of parents to raise their children is an "essential" and "basic" civil right.  Furthermore, the parents' right to custody of their children has been described as "paramount."  In fact, the permanent termination of parental rights has been described as "the family law equivalent of the death penalty."  "Therefore, parents 'must be afforded every procedural and substantive protection the law allows.'"

For these reasons, both R.C. 2151.352 and Juv.R. 4 establish a parent's right to counsel in termination proceedings.  A parent's right to counsel arises from the guarantees of due process and equal protection contained in the constitutions of Ohio and the United States.  That right to counsel includes the right to the effective assistance of trial counsel.  The test for ineffective assistance of counsel used in criminal cases is equally applicable to actions seeking the permanent, involuntary termination of parental custody.  (Internal citations omitted.)  *In re S.A.*, 2d Dist. Clark No. 07-CA-110, 2008-Ohio-2225, ¶ 7-8.

{¶ 32}  We review claims of ineffective assistance of counsel under the two prong analysis set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674

(1984), and adopted by the Supreme Court of Ohio in *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373 (1989).   To reverse a judgment based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that counsel's errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. *Strickland,* 466 U.S. at 688.   Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance.   *Id.*

**{¶ 33}**   First, Iva claims that her counsel should have objected to questions concerning Iva's drug tests during all of the hearings regarding B.B. and L.B.   As discussed above, the results of her drug screens constituted hearsay and did not fall within the business records exception to the hearsay rule.

**{¶ 34}**   CSB nevertheless argues that Iva's trial counsel could have reasonably elected not to object to the admission of her test results as part of his trial strategy.   It states: "By objecting to the results of Appellant's drug screens, trial counsel would have not only excluded positive drug screens, but also her negative screens as well.   Without evidence of Appellant's negative drug screens, the court would have been presented with no favorable evidence regarding Appellant's drug use."

**{¶ 35}**   " 'Generally, counsel's performance falls below the norm if he fails to advocate the defendant's cause, fails to keep the defendant informed of important developments, or fails to use the requisite level of skill necessary to ensure the integrity of the adversarial proceedings.' "   *State v. Williams*, 2d Dist. Greene No. 2011 CA 44, 2012-Ohio-1240, ¶ 31, quoting *State v. Peeples,* 94 Ohio App.3d 34, 640 N.E.2d 208 (4th

Dist.1994). "Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel." *State v. Mitchell,* 2d Dist. Montgomery No. 21957, 2008-Ohio-493, ¶ 31.

{¶ 36} In this case, we agree that it was reasonable for counsel to elect not to object to the testimony regarding Iva's drug screen results. As argued by CSB, the drug screen results informed the court that Iva had negative as well as positive drug tests. Without such testimony, there was uncontroverted evidence of Iva's drug use.

{¶ 37} Even if counsel were deficient in failing to object to the drug test results, we cannot conclude that the outcome of the case regarding B.B. and L.B. would have been different. As with the hearing regarding E.B., there was substantial non-hearsay evidence at the March 2010, September 2010, and February 8, 2011 hearings to support a conclusion that Iva had a lengthy history of drug abuse and had not yet ceased to abuse drugs.

{¶ 38} Joe West of Women's Recovery Center testified at the March 2010 hearing that Iva had left treatment after less than one week, and he stated at the September hearing that she was not admitted in August 2010 due to a positive drug screen. There was testimony that Iva was repeatedly assessed by TCN Behavioral Health and was repeatedly recommended for intensive outpatient treatment, but she missed numerous sessions or did not attend at all. In addition, CSB employees testified regarding problems in the home and Iva's continued contact with her adopted brother, who had molested one of her children. Iva's probation officer testified that she failed to complete drug and alcohol evaluations and failed to meet with him during her probation in 2009, and she ultimately served a jail

sentence for disorderly conduct and driving under suspension.

{¶ 39} Iva, Larry, Paige and Ryan each testified at the February 8 hearing. With respect to Iva, Ryan testified that Iva reported being assessed for drug treatment, and that she was recommended for inpatient detoxification treatment. Iva had stated that she entered that program after tubal ligation surgery on February 11, 2011. Paige stated that Iva had not completed the drug treatment portion of the case plan while she had been the caseworker for the family.

{¶ 40} During Larry's testimony, CSB's attorney asked if he would agree that Iva has a drug problem. Larry responded, "Of course." Although he stated that he did not know how long Iva has had a drug problem, Larry stated that it has been at least for the past two years, and he agreed that Iva needed to get drug treatment. Larry testified, "I've stated that to her [Iva] a few times myself."

{¶ 41} Iva testified at the February 8 hearing that she had been evaluated for drug treatment in January 2011, and planned to go after her tubal ligation. Iva stated that she would need to be reassessed before she could enter treatment. When asked whether she had used cocaine, marijuana and other drugs within the past month, Iva answered, "I relapsed maybe, I think twice [within the past two months]. That's what they call relapse." Considering the substantial non-hearsay evidence of Iva's struggle with drug abuse, Iva has not established that her counsel was ineffective in failing to object to the drug test results.

{¶ 42} Iva further claims that her attorney should have objected to CSB's question to Iva about the result of her drug tests. During the February 8 hearing, CSB asked Iva if she had tested positive for drugs within the past month. Iva answered, "I don't know. I

haven't really heard no results on my test results." Because Iva did not testify regarding her results, we find no basis to conclude that CSB's question and Iva's answer were unfairly prejudicial to her.

{¶ 43} Iva also asserts that her counsel should have objected to Dr. Battle's testimony regarding Iva's drug usage. Counsel did object to some of Dr. Battle's statements regarding Iva's substance abuse, which were based on Iva's self-reports and CSB records. However, based on the record as a whole, we cannot say that the outcome of the hearing would have been different without the portion of Dr. Battle's testimony that was not based on Iva's own acknowledgment of her substance abuse.

{¶ 44} Finally, Iva claims that her counsel was deficient in failing to object to Dr. Battle's testimony regarding her psychological tests for lack of foundation and to Dr. Battle's opinions as not being offered within a reasonable degree of psychological certainty.

{¶ 45} Dr. Battle, a clinical psychologist who had been declared an expert in Greene County on many occasions, testified at the February 1 hearing concerning E.B. regarding her evaluation of Iva and offered an opinion as to whether Iva was capable of providing safe and effective parenting to her children. Dr. Battle indicated that she had received semi-annual administrative reviews from CSB, case progress reviews, and legal documents prepared by CSB, with the documents dating from November 2008 to July 13, 2010. Dr. Battle communicated with Iva's caseworker at the time, Paige, and conducted evaluations of Iva on July 21, 2010 and August 19, 2010. Dr. Battle also conducted a home visit.

{¶ 46} Dr. Battle expressed that it was difficult to obtain a reliable social history

from Iva, because Iva tended to minimize her problems. She indicated that Iva would express good intentions that were never realized. Iva had indicated, among other things, that she attended special education classes due to her inability to learn to read. Iva had stated that she could read "a little, not big words" and that she depended on Larry to help her with words she did not know. Iva had low self-esteem, except for two activities that she liked to do, cooking and cleaning. Iva admitted to smoking cigarettes, drinking beer daily, and "on and off" use of cocaine "throughout the years."

{¶ 47} Dr. Battle performed clinical testing, including the Wexler Adult Intelligence Scale, revised form, and a personality test. Dr. Battle found that Iva was in the "borderline retarded" range of intelligence. The tests of Iva's ability to comprehend and apply what she has learned resulted in a score of 2, with 10 being a score of average IQ. With respect to testing where Iva was required to come up with solutions to common everyday problems, Dr. Battle testified that

> it was clear from this group of tests and her overall score that she would have difficulty understanding anything but simple instructions, and it would be very hard for her to understand the cause and effect between her behavior and the consequences for herself or others. So that difficulty, combined with the impulse control problems exhibited, it would be very hard for her to plan for the future and to inhibit her behavior because of the negative consequences for herself or others * * *.

{¶ 48} Dr. Battle opined that "it was unlikely and improbable with a reasonable degree of psychological certainty that [Iva] would be able to complete the [Women's

Recovery] program, both the inpatient and the outpatient portion of it, and to maintain her sobriety and her recovery over the long-term." She further concluded that Iva's "borderline retarded" intelligence posed "significant limitations on her abilities to understand, to reason, and to connect cause and effect relationships that she is compromised and unable to perform the necessary parental functions that her children require in order to develop in a healthy way." In addition, Dr. Battle concluded that Iva had "little ability to regulate her negative feelings or any of her feelings because she has relied on drugs to either anesthetize herself from painful feelings * * * or to elevate her mood." Dr. Battle noted that Iva was modeling dependence on drugs or alcohol for her children and that she had low self-esteem. Dr. Battle summarized:

> My conclusion is that because of her intellectual limitations, her tendencies to lie and deny reality, coupled with the longevity of her substance abuse, the possibility of her changing sufficiently to become capable of effectively parenting her five children is unlikely. And I concluded with a reasonable degree of psychological certainty that she is unable to satisfactorily and effectively care for her children.

{¶ 49} Upon review of the record, we conclude that the trial court properly considered the conclusions offered by Dr. Battle, which were based on a reasonable degree of psychological certainty.

{¶ 50} Iva's first assignment of error is overruled.

IV.

{¶ 51} The trial court's judgments will be affirmed.

. . . . . . . . . .

FISCHER, J., concurs.

HALL, J., concurring

{¶ 52} I agree with the judgment of the majority. I write separately concerning the analysis of the second assignment of error.

{¶ 53} The majority opinion cites *Royse v. Dayton*, 195 Ohio App.3d 81, 2011-Ohio-3509, 958 N.E.2d 994 (2d Dist.), for the proposition that required drug-screen test results cannot be introduced into evidence as the employer's records under the business-records exception to the hearsay rule. I dissented in *Royse*, primarily on the ground that the rules of evidence should not apply to an administrative civil service hearing. *Royse* is presently on appeal in the Ohio Supreme Court and the above proposition is at issue. In light of my dissent and the appeal, I hesitate to view *Royse* as authority for excluding the drug-screen test results in this case.

{¶ 54} Furthermore, I think that in this case most, if not all, of the mother's failed drug tests are admissible under the business-records exception. The mother's case plan required her to complete 20 drug-screen tests; she completed only 7. The failure or refusal to complete a drug test is generally tantamount to testing positive. Surely the caseworker can testify that the mother tested positive 13 times because she failed or refused to complete those tests. This leaves at issue five positive tests, the ones that the mother did complete, that were introduced into evidence. The drug-screen test process and the reporting of results were the subject of testimony and argument on pages 105-111 of the transcript. The testimony indicated that a case aide obtains a swab and sends it to an outside lab for analysis. The lab

sends back a report containing the results of its analysis. The report is given to the appropriate caseworker and the results of the drug-screen test are recorded. These records, then, were apparently prepared as part of a routine, not for evidentiary purposes. There is absolutely no evidence, nor any inference from the evidence, that the information in the report is untrustworthy. Each person involved in the process had a duty to provide accurate information.

{¶ 55} I fail to see how this situation is any different from a physician being permitted to testify about the results in a lab report after the physician sent the patient to the lab for blood work (or an x-ray or an MRI), received the report from the lab, and relied on the report's accuracy in determining the course of treatment. Perhaps in a criminal case there might be an issue concerning confrontation, due process, or the chain of evidence that would militate against admitting drug-screen test results contained in an outside lab's report. But this is a civil case. Moreover, when the trial court allowed the caseworker to testify about the drug-screen test results, the court indicated that it would also require the State to submit the original test reports. Counsel for the defendant said, "We would make the same request, Your Honor." (Tr. 111). Thus the defendant agreed to have the court consider the original test reports. In the circumstances of this case, I would not hold that the trial court abused its discretion by admitting the drug screen test results.

{¶ 56} Nevertheless, in the final analysis, we do not need to address the admissibility of this testimony because the mother admitted using drugs while under CSB supervision: when asked if she denied using drugs during that time, the mother answered, "No, I don't," and she agreed that she tested positive. (Tr. 349). Accordingly, even if the trial

court erred by admitting the testimony, the error was harmless.

. . . . . . . . . .

(Hon. Patrick F. Fischer, First District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio).

Copies mailed to:

Nathaniel R. Luken
Pamela L. Pinchot
Hon. Robert W. Hutcheson